**JONES v. HELVERING, Commissioner of Internal Revenue (three cases).**

**JONES et al. v. SAME.**

**Nos. 6046–6049.**

Court of Appeals of the District of Columbia.

Argued March 13, 1934.

Decided April 23, 1934.

Louis Loeffler, of Bristow, Okl., and Joseph F. Moore and F. Edward Mitchell, both of Washington, D. C., for petitioners.

Sewall Key, Warren F. Wattles, E. Barrett Prettyman, and Shelby S. Faulkner, all of Washington, D. C., for respondent.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

GRONER, Associate Justice.

The above-entitled cases were consolidated by agreement and were heard here as one case.

In December, 1915, four brothers organized and became the only stockholders of the Bermont Oil Company, a Delaware corporation. The company began business in January, 1916. Three of the brothers are petitioners in the three first above numbered cases. The other died in 1927, and his estate is represented by his executors. We shall speak of the petitioners in all four cases as taxpayers.

In his return of net income for the year

1921, each taxpayer claimed as a deduction, under section 214 of the Revenue Act of 1921 (42 Stat. 240), loss claimed to have been sustained by him from the sale in 1921 of certain municipal and United States Liberty Loan bonds. Each claimed the loss as representing the difference between the cost of the bonds in 1917 when he acquired them and the selling price in 1921.

The four taxpayers owned in unequal shares certain oil properties and businesses in Oklahoma prior to the organization of the Bermont corporation. After the organization of the corporation, they transferred to it certain valuable oil properties and paid $100,000 in cash in exchange for all of its capital stock. They also sold to the corporation certain oil field equipment and materials, for which they were given credit on the books of the corporation. The proportion of stockholdings and the credit balances as between the several taxpayers varied in marked degree. Each of them drew against the corporation by check or by order for such amount of his balance as he wished to withdraw, just as he would if he were dealing with a bank. When the corporation paid out anything on account of any of the taxpayers, it charged it to his individual account.

In 1917 the taxpayers severally had with the corporation credit balances aggregating approximately $4,000,000. They agreed with one another that they would invest this fund in government securities, and that the bonds purchased by any one of them should be held for the account of all in proportion to each one's stockholdings in the corporation. On their order the corporation issued checks in excess of $3,000,000 for the purchase of Liberty bonds and Oklahoma City Waterworks bonds. The bonds so purchased were allotted to the four taxpayers in the proportion of their stockholdings in the corporation. A charge was made against the account of each taxpayer for the amount of bonds thus acquired by him individually. Each of the taxpayers had sufficient funds on hand to his credit with the corporation to pay for his purchase of bonds. Thereafter and until the sale of the bonds in December, 1921, each taxpayer received and used the interest from the bonds allotted to him individually. After the purchase of the bonds, the taxpayers at the end of each calendar year, beginning December 31, 1917, and continuing to December 31, 1920, transferred the bonds to the corporation, and the corporation credited the several taxpayers' personal accounts with their respective proportionate share of the

amount of the original purchase price of the bonds. On the 2d of January of 1918 and thereafter each year until and including the 2d of January, 1921, the bonds were transferred back to the taxpayers in the same proportionate amounts as when transferred on the preceding December 31, and a debit was made against each taxpayer in the amount of the previous credit. The transaction in each year was confined to bookkeeping entries. The Board of Tax Appeals commented on these transactions as follows:

"Counsel for the petitioners admits and the evidence shows that the book entries made at or about December 31 and January 1 [2d] of the years 1918–1919, 1919–1920, 1920–1921, and purporting to pass title to the bonds to and fro between themselves and the corporation were mere 'wash' transactions for the purpose of avoiding Oklahoma ad valorem taxes and that it was never intended that title to the property should be affected thereby."

On December 15, 1921, the four taxpayers respectively again transferred the bonds to the Bermont Oil Company and were given credit severally on the books of the corporation for the amount of money representing the then market value of the bonds belonging to each of them individually, and the money so placed to the credit of each was used by him as occasion demanded. The corporation thereafter continued to own the bonds, to collect and use the interest thereon, and ultimately, apparently around 1928, it sold them for its own account. The market price on the transaction just above mentioned, i. e., the sale of December 15, 1921, was less than the original cost price, and each taxpayer took the loss representing this difference in the bonds which he individually owned. The Commissioner disallowed the deduction, and the Board of Tax Appeals, on petition to it, sustained the Commissioner.

In its first decision, the Board said:

"The transactions here involved were between a close corporation and its only stockholders who were in absolute control of all its affairs and acts. In these circumstances it is apparent that none of the transfers can be regarded as transactions at arm's length between a willing seller and a willing buyer."

In a subsequent memorandum opinion, the Board apparently changed its theory and placed its decision on the ground that petitioners had failed to show that the bonds were purchased or paid for by them or that at the time of the sale to the corporation (1921) they held title to them. What the Board

meant was that the evidence did not satisfactorily show that the original purchase was made for the individual account of the taxpayers. As to this last, we have been at pains to examine carefully the evidence and to look to the facts stipulated to determine whether there was a failure of proof in the respect mentioned, for, while we have often said we will not weigh the evidence nor substitute our opinion for that of the Board where the evidence is conflicting, we have never said, nor are we willing to say, that we may properly abdicate our responsibility to give the evidence or the stipulated facts careful consideration. And when, as a result of this, it appears to us that the evidence is uncontradicted and unimpeached, we think we are bound, without regard to the Board's finding, to give it effect. Iowa Bridge Co. v. Commissioner (C. C. A.) 39 F.(2d) 777, 780; St. Paul Abstract Co. v. Commissioner (C. C. A.) 32 F. (2d) 225, 226; Kendrick Coal & Dock Co. v. Commissioner (C. C. A.) 29 F.(2d) 559. And so here we find uncontradicted evidence of the fact that the bonds were in fact originally purchased for the several taxpayers respectively and paid for with their money, and nothing which will justify the suggestion that the purchase in 1917 was for the account of the corporation. This evidence is, first, the books of account of the taxpayers and also of the corporation, which reflect the transaction precisely as taxpayers contend; second, the testimony of Ekdahl, the secretary of the corporation, that the bonds, though paid for by the check of the corporation, were purchased on the order of taxpayers for the account of the individual taxpayers respectively and paid for exclusively with their funds; third, that the purchase of the bonds (in 1917) was never authorized or discussed by the directors of the corporation; fourth, the testimony of Elliott Jones and Bernard Jones, two of the taxpayers, to the same effect; fifth, the showing by the records introduced in evidence that there was at the time ample funds to the credit of taxpayers with the corporation and the use of these funds for their individual transactions just as in the case of a similar deposit in a commercial bank; sixth, that in 1920 one of the taxpayers withdrew some $250,000 of the bonds in question belonging to him and sold them in the market at a loss, which loss he took in his personal return for a prior year to that we are now concerned with; and, finally, the stipulated fact that the bonds "were owned by the petitioners in relative amounts as set forth above." This evidence of original purchase and ownership being clear and uncontradicted, we are compelled to accept it as the fact, and accordingly we have a case in which four individuals in 1917 purchased approximately $3,000,000 of bonds at par for cash, which some five or six years later they sold at a loss of five points. Stated in this way, it is obvious the transaction comes precisely within the terms of sections 202 (a) and 214 (a) (5) of the Revenue Act of 1921 (42 Stat. 229, 239, 240).

This leaves the question in the case to depend upon the weight to be given to the fact that the ultimate sale out of which the claimed loss grew was to a corporation wholly and entirely controlled by the four sellers. In determining what effect, if any, this fact should properly have, we are also asked to consider what additional effect, as showing intent, should be given to the transfers preceding the final sale which admittedly were made for the purpose of avoiding the state ad valorem tax. Counsel for the Commissioner informs us that the Commissioner does not charge actual fraud. He says the Commissioner merely determined that the final transaction, as carried out, was ineffective as a sale giving rise to a deductible loss, and this, counsel says, is very different from charging petitioners with fraud, and we agree in this. Therefore the Commissioner's position is that the sale of December 15, 1921, was not a bona fide sale to taxpayers' corporation, because of "lack of bona fide intent in arm's length dealing," and this the Commissioner tells us vitiated the transaction for income tax purposes. The Board expressed it this way: "The corporation had no voice in the matter. By mere book entries it was made to take the bonds in question into its property account at prices over which it had no control. It was entirely within the power of the petitioners to fix the price at which the ostensible sale of bonds was made just as it had been in previous years to transfer and retransfer at prices that best suited their purposes."

We fully agree with the Board that the taxpayers had the power to cause the corporation to take the bonds at such price as taxpayers might impose, and, if taxpayers had used this power to make the sale at a fictitious price and thereby create, or attempt to create, a fictitious loss for deduction purposes, we should have an altogether different case and one we should not hesitate to brand as fraudulent in fact, but here, admittedly, the price at which the bonds were sold to the corporation was the market price at the time

of sale, and, if the sale was otherwise bona fide, the claimed amount of loss is uncontested.

That brings us back to the single query whether the possession of the power to do the thing the Board denounces, that is to say, the ability through stock ownership to control the corporate action, is sufficient to make a sale otherwise unobjectionable subject to be treated as a nullity for tax purposes. The only argument that can be urged in the affirmative is that it is against public policy to allow a taxpayer to incorporate his business in such a way as through manipulation or transfers between himself and it he can place the one or the other beyond the reach of the taxing statutes, and there is great force to the argument. But, so far as we know, in cases where the element of fraud in fact is lacking, it has been the invariable holding that a taxpayer may resort to any legal methods available to him to diminish the amount of his tax liability. Bullen v. State of Wisconsin, 240 U. S. 625, 630, 36 S. Ct. 473, 60 L. Ed. 830. In Iowa Bridge Co. v. Commissioner, supra, at page 781 of 39 F.(2d), Judge Gardner, speaking for the Court of Appeals in the Eighth Circuit, said: "In fact, it is held that even though the transaction is a device to avoid the burden of taxation, or to lessen that burden, it is not for that reason alone illegal." See also United States v. Isham, 17 Wall. 496, 506, 21 L. Ed. 728.

Here, as we have seen, the Commissioner makes no charge of actual fraud, but on the contrary concedes that there was none. The corporation itself was legally organized and possessed all the powers and attributes of an ordinary business and, we may also assume, banking corporation. It was formed, so far as we can tell, to permit such of the business affairs of its incorporators as they should deem wise to be managed and controlled through it. It acted in many respects as their banker and cashed their checks and orders for money as a commercial bank would have done in like circumstances. In December, 1921, the corporation bought the bonds and paid for them by crediting the account of each taxpayer in the amount he was entitled to receive, and thereafter it continued to hold the bonds as absolute owner. That the result of this was to enable taxpayers to claim a deductible loss in their income and at the same time, by reason of control of the corporation, to retain an indirect interest in the bonds is undoubtedly true, but it is for the legislature and not the courts to find a way of taxing such a transaction. As the matter now stands, inequitable as it may appear, there is no statute condemning it. The Supreme Court has been at great pains to point out time and again that a corporation is a legal entity and as such wholly different and distinct from its shareholders. In a recent case the court said: "But it leads nowhere to call a corporation a fiction. If it is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members." Klein v. Board of Supervisors, 282 U. S. 19, 24, 51 S. Ct. 15, 16, 75 L. Ed. 140, 73 A. L. R. 679. And again: "A leading purpose of such statutes [incorporation laws] and of those who act under them is to interpose a nonconductor, through which, in matters of contract, it is impossible to see the men behind." Donnell v. Herring-Hall-Marvin Safe Co., 208 U. S. 267, 273, 28 S. Ct. 288, 289, 52 L. Ed. 481. See, also, Burnet v. Commonwealth Co., 287 U. S. 415, 53 S. Ct. 198, 77 L. Ed. 399; Burnet v. Clark, 287 U. S. 410, 53 S. Ct. 207, 77 L. Ed. 397; Dalton v. Bowers, 287 U. S. 404, 53 S. Ct. 205, 77 L. Ed. 389.

The transactions between taxpayers and the corporation occurring annually at the end of each calendar year, as a result of which the corporation, by acquiring taxpayers' nontaxable bonds, escaped an ad valorem state tax, admittedly resulted, so far as federal taxes are concerned, in neither gain nor loss, and in January, 1921, left the bonds in the hands of their original purchasers, the taxpayers. As we have already said, these annual transactions were purely bookkeeping entries, and the mutual intent was that, the purpose accomplished, i. e., avoidance of the state tax, the status quo should be restored. But the testimony is also that, in the latter part of 1921, taxpayers, or some of them, needed money for individual purposes, or, as one of them testified, to pay his debts, and therefore sold the bonds outright to the corporation and received the prevailing market price in money from the corporation and used the money for their individual purposes, and the corporation itself continued thereafter to own the bonds. If this is true, and the evidence clearly establishes that it is, it follows, if we are to give effect to the decisions of the Supreme Court holding under like conditions the legal entity of the corporation may not be disregarded, that the conclusion of the Board, based on the fact that,

because the transaction was between the corporation and its controlling stockholders, it was not an arm's length transaction, is without force; and since, as we think, the other conclusion of the Board, viz., that the original purchaser was not sufficiently identified, is clearly in the face of the uncontradicted evidence, it is our duty to reverse the Board's holding and remand the cases, with instructions to enter a final decision sustaining the petitions.

Reversed and remanded.