**STANDARD OIL CO. v. UNITED STATES.**
Civil Action No. 21127.

District Court, N. D. Ohio, E. D.
Oct. 2, 1945.

M. E. Newcomer and Isador Grossman, of McAfee, Grossman, Hanning. & Newcomer, all of Cleveland, Ohio, for Standard Oil Co.

John Fisher, Sp. Asst. to Atty. Gen., and Frances B. Kavanagh, Asst. U. S. Atty., of Cleveland, Ohio, for the government.

FREED, District Judge.

The Standard Oil Company of Ohio has instituted this suit to recover excise taxes in the sum of $158,120.51, plus interest. Standard contends this tax was illegally assessed against, and collected from it, in connection with the sale of gasoline and lubricating oils.

The case was submitted to the Court upon lengthy stipulations and after extended oral testimony. Comprehensive briefs, submitted together with the transcript of the testimony, gave the Court an opportunity to re-examine the facts after trial.

The taxes in question were assessed against Standard and its subsidiaries, Caldwell & Taylor Corporation and Fleet-Wing Corporation, under Section 601(c)(1) and Section 617(a) of the Revenue Act of 1932, 26 U.SC.A. Int.Rev.Acts, pages 604, 616, and Section 617(a) as amended by Section 211(a) of the National Industrial Recovery Act of 1933, 26 U.S.C.A. Int.Rev.Acts, page 616. These Acts impose a tax upon the sale of gasoline and lubricating oils by a producer. Immediately prior to the effective date of the Acts in question Standard sold certain quantities of gasoline and lubricating oils to its subsidiaries, Caldwell and Fleet-Wing.

In its bill of complaint, Standard contends: (1) That these transactions were in the normal course of business, dictated by sound business practice, (2) that they were bona fide sales made to companies which were independent in operation and separate entities from the parent corporation, (3) that the assessments were unlawful, (4) that its claims for abatement should have been granted and were wrongfully rejected, (5) that it paid all of the unabated portion of the tax so levied, under protest, and filed a timely claim for refund in the Commissioner's office, and (6) that the Commissioner of Internal Revenue was in error when he found the transactions were not bona fide sales, that they were colorable, and that Fleet-Wing and Caldwell were mere instrumentalities and agencies of Standard. It asks judgment in the amount of its payment, plus interest.

The Government, in its answer, denies the Commissioner was in error in rejecting the claim for refund. It asserts: (1) That the taxes in question sought to be recovered by Standard, were not borne by the taxpayer or its subsidiaries, (2) that they were passed on to the ultimate purchasers of the plaintiff and its subsidiaries, (3) that any recovery by Standard would constitute unjust enrichment. It challenges this Court's jurisdiction because the claim for refund relied upon by plaintiff is insufficient.

Before trial the Government filed a motion to dismiss the action, which the Court took under advisement for determination after the matter had been submitted on the merits.

The motion is predicated upon the requirements of the statute and Treasury regulations in question.

"§ 621. Credit and Refunds.

"(d) No overpayment of tax under this title shall be credited or refunded (otherwise than under subsection (a)), in pursuance of a court decision or otherwise, unless the person who paid the tax establishes, in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, (1) that he has not included the tax in the price of the article with respect to which it was imposed, or collected the amount of tax from the vendee, or (2) that he has repaid the amount of the tax to the ultimate purchaser of the

article, or unless he files with the Commissioner written consent of such ultimate purchaser to the allowance of the credit or refund." 26 U.S.C.A. Int.Rev.Acts, page 620.

Treasury Regulation 44 (1934 Edition):

"Art. 84. Credit and Refunds.

"In all cases where a person overpays tax, no credit or refund shall be allowed (except as provided in the preceding paragraph), whether in pursuance of a court decision or otherwise, unless the taxpayer files a sworn statement explaining satisfactorily the reason for claiming the credit or refund and establishing (1) that he has not included the tax in the price of the commodity with respect to which it was imposed, or collected the amount of tax from the vendee, or (2) that he has either repaid the amount of tax to the ultimate purchaser of the commodity or has secured the written consent of such ultimate purchaser to the allowance of the credit or refund. In the latter case the written. consent of the ultimate purchaser must accompany the sworn statement filed with the credit or refund claim. For the purpose of the tax the 'ultimate purchaser' is a person who purchased an article (1) for consumption, or (2) for use in the manufacture of other articles and not for resale in the form in which it was purchased. * * *"

The motion urges that the application for a refund filed before the Commissioner was defective. It further maintains that in this action for the recovery of the taxes there is included a new ground for recovery, neither pleaded nor proved in the claim for a refund before the Commissioner. This contention is moot in view of the fact that, before trial, Standard moved to strike from its bill of complaint the paragraph which raised this issue, which motion the Court hereby grants.

The sworn statement, concluding a lengthy and minute delineation of the exact nature of the claim, which the Government contends was found by the Commissioner to be insufficient to support a claim for refund, is as follows:

"The undersigned, Caldwell & Taylor Corporation and Fleet-Wing Corporation, by their proper officers thereunto duly authorized, hereby join in the foregoing claim for refund, and hereby consent to the granting of such refund as shall be properly allowable and the payment thereof together with interest to the Standard Oil Company (Ohio).

"The undersigned further certify that the entire amount of excise taxes and interest referred to in the foregoing Refund Claim was paid by the Standard Oil Company (Ohio) and that no portion thereof was paid by either of the undersigned.

"Caldwell & Taylor Corporation,
"By Clyde T. Foster,
"President.
"Fleet-Wing Corporation,
"By W. J. Semple,
"Vice-President.

"Sworn to before me and subscribed in my presence this 20th day of May, 1939.

"Russell G. Grahame,
"Notary Public."

The language of this sworn statement taken together with the claim for refund filed before the Commissioner, in the Court's judgment, means: (1) That Standard paid all of the tax which it is seeking to have refunded to it, and (2) that by its proper officers Fleet-Wing and Caldwell, the purchasers of the gasoline and oil, say that they did not pay any portion of the taxes so assessed.

It is significant to note that the claim before the Commissioner, as it has been in the trial before this Court, is predicated on the proposition that the transactions between Standard and Caldwell and Fleet-Wing were at arm's length, bona fide, and between separate entities.

Standard admits, at the outset of this suit, as it did before the Commissioner, that if the ruling is adverse on these claims, it is liable for the amount of taxes so assessed.

It is evident from the long and involved contention made by the Government with respect to its motion to dismiss, that it believes that a finding by the Commissioner that a proper sworn statement by the taxpayer has not been filed and established is so conclusive upon the Court, that no action for refund may be maintained. In other words, it is the position of the Government that the finding of the Commissioner as to the sufficiency of the sworn statement is a finality, so conclusive upon the Court, that the finding, in and of itself, entitles the Government to the granting of a motion to dismiss the action. It says that this is true despite any conclusion that the Court might reach as to the efficacy of the sworn statement and the establishment be-

fore the Commissioner of whether the tax was or was not passed on.

With respect to the Government's contention on this matter, this Court finds no support either in the statute or the regulations, or in the many adjudicated cases arising under this Section.

■ While there is no doubt that the sworn statement fully complied with both the statute and the regulations, it is the Court's judgment that the facts in the instant case definitely spell out a waiver of the defect claimed, if such defect did exist.

■ It must be recognized that since Tucker v. Alexander, 275 U.S. 228, 48 S. Ct. 45, 72 L.Ed. 253, it has been well settled that the Commissioner may not waive *any requirement of the statute, but it is* equally well settled that it is within his power to waive the requirements of the regulations.

As Mr. Justice Frankfurter observed in Angelus Milling Company v. Commissioner, 325 U.S. 293, 65 S.Ct. 1162, 1164, the situation under which the Commissioner has the power to waive and the facts which spell out the waiver are not made "crystal-clear by the authorities." The language by Mr. Justice Frankfurter in the Angelus case is particularly pertinent to the question of waiver here urged:

"Treasury Regulations are calculated to avoid dilatory, careless, and wasteful fiscal administration by barring incomplete or confusing claims. Tucker v. Alexander, supra, 275 U.S. at page 231, 48 S.Ct. at page 46, 72 L.Ed. 253; Commissioner v. Lane-Wells Co., supra, 321 U.S. [219] at page 223, 224, 64 S.Ct. [511] at page 513, 88 L.Ed. 684, But Congress has given the Treasury this rule-making power for self-protection and not for self-imprisonment. If the Commissioner chooses not to stand on his own formal or detailed requirements, it would be making an empty abstraction, and not a practical safeguard, of a regulation to allow the Commissioner to invoke technical objections *after he has investigated the merits of a claim and taken action upon* it.* Even tax administration does not as a matter of principle preclude consideration of fairness.

"Since however, the tight net which the Treasury Regulations fashion is for the protection of the revenue, courts should not unduly help disobedient refund claimants to slip through it. The showing should be unmistakable that the Commissioner has in fact seen fit to dispense with his formal requirements and to examine the merits of the claim. It is not enough that in some roundabout way the facts supporting the claim may have reached him. The Commissioner's attention should have been focused on the merits of the particular dispute. The evidence should be clear that the Commissioner understood the specific claim that was made even though there was a departure from form in its submission. We do not think that the petitioner has made out such a case here."

It is noteworthy that in rejecting the claim of Angelus Milling Company that there had been a waiver by the Commissioner, Justice Frankfurter found that the mere act of incepting an investigation, in and of itself, short of a finding by the Commissioner on the merits, was insufficient to spell out a waiver of the formal requirements. However, in this case no such question is presented. The Commissioner here did completely examine the merits of the case, and did make a final finding upon the merits.

The Samara case, infra, fully answers the Government's contention that the Court has no jurisdiction to entertain this action because the claim for refund is insufficient:

"As we see it, the letters of the Commissioner indicate clearly that he examined on the merits the appellant's claim for refund and rejected it because the evidence submitted did not establish to his satisfaction, as required by section 902, that the claimant had not shifted the burden of the tax. That section plainly contemplates that the trial court may be satisfied on that issue, although the Commissioner was not. Consequently a rejection of the claim on that ground cannot mean that the court lacks jurisdiction to entertain a suit to recover the refund disallowed by the Commissioner." Samara v. United States, 2 Cir., 129 F.2d 594, at page 596, certiorari denied 317 U.S. 686, 63 S.Ct. 258, 87 L.Ed. 549.

The motion to dismiss, therefore, will be overruled. The same ruling applies to the identical contentions contained in the Government's amended answer.

The disposition by the Court of the preliminary question here presented, brings it to a consideration of the merits of this

---

* Emphasis supplied.

case. Generally stated, the issue is: Were Caldwell and Fleet-Wing agencies and instrumentalities of Standard in the sense that, for tax purposes, the sales of gasoline and oil products by the subsidiaries should be regarded as sales by Standard? To resolve this issue, these questions must be answered: Were these transactions bona fide sales? Were they consummated for the *sole* purpose, and that alone, of avoiding the taxes? Were they in the usual course of business between the parent and the two subsidiaries? To what extent were Fleet-Wing and Caldwell autonomous, independently operating units, free from control and domination by Standard?

It cannot be questioned that unless it is established that the sales were valid sales, as between a producer and two non-producers, and the transactions between the parties were at arms' length, the two subsidiaries were autonomous, self-operating organizations, no right of recovery exists. For it is conceded by Standard that unless it bears the burden of establishing these facts favorable to its cause, that it is liable for the payment of the taxes sought to be recovered.

Therefore, the histories of Caldwell and Fleet-Wing in respect of their corporate organization, operation, and their usual manner of doing business with Standard become important in the determination of the merits of this case.

Caldwell was organized in 1929 by the acquisition of all the property, assets and goodwill of four predecessor companies, previously engaged in the business of selling oil products at wholesale and retail. At the time of its organization the predecessor companies had been extremely successful, and had built up a volume of business in the areas in which they operated, admittedly greater even than that of Standard, which operated in competition with them. At the time of the organization of Caldwell, Standard acquired eighty per cent of its common stock and $733,000, par amount of its preferred non-voting shares. A. B. Caldwell, who became its president and general manager as well as a director, acquired twenty per cent of the common stock and $183,000 of its non-voting preferred. Caldwell's personal counsel, Clarence N. Smith, became its vice-president and a director and Fred T. Boeschlin, Mr. Caldwell's chief accountant, became treasurer. C. T. Foster, assistant to the president of Standard, became sec-retary of Caldwell and a director, and the other two directors, M. E. Newcomer, and George W. Hazlett, both were of general counsel for Standard.

Following the creation of the new corporation it continued to do business as its predecessors previously had, except that it purchased most of its gasoline and oil supplies from Standard. It maintained its own general offices in Cincinnati. It had its own selling and accounting staff. It maintained its own office personnel. It owned and operated fully equipped service stations throughout the Cincinnati and Dayton areas, and under its own management conducted an extensive business on leased sites. It had its own bulk plant, tank trucks, a good deal of equipment and was a fully self-operating gasoline and oil marketing business and was not subject to any control by Standard. Caldwell, independently of Standard, negotiated loans from banks, purchased and resold products, and in the course of this business purchased from suppliers with whom Standard was in direct competition. Caldwell conducted extensive advertising campaigns on behalf of its own trade-name products, and at the time of this transaction the monthly volume of gasoline sales through its numerous outlets was in excess of 1,400,000 gallons per month. The matters upon which Caldwell consulted Standard dealt with major policy only. Some time prior to the transaction Standard had purchased from Mr. Caldwell all of his common stock and at that time Standard owned all the outstanding shares of Caldwell with the exception of Mr. Caldwell's $147,000 of preferred non-voting stock.

Fleet-Wing was organized on November 30, 1928. It acquired all the assets, goodwill and business of Spears and Riddle of Wheeling, West Virginia. Upon the organization of Fleet-Wing, Standard acquired $211,000 of its non-voting preferred stock and 75 per cent of its common voting stock. Harry F. Spears, formerly vice-president and general manager of the predecessor corporation, acquired 25 per cent of Fleet-Wing's common voting stock, and became president, general manager and a director of the new corporation. M. E. Murrin, formerly with Spears and Riddle, became treasurer of Fleet-Wing. The other directors and officers of Fleet-Wing all were associated with Standard. Until September 1, 1930, Fleet-Wing maintained general offices at Bellaire, Ohio, and subsequent to

that date moved its offices to Cleveland, Ohio, where it conducted its affairs in substantially the same fashion as it previously had. It maintained its own separate offices, records, maintained its own clerical and administrative staff, hired its own salesmen, and paid its own expenses. It kept its own bank account, and independent of Standard, maintained its own line of credit.

The business of Fleet-Wing was, as it had been, a wholesale business. At the time of its organization it took over the business of Spears and Riddle, which at the time had more than 100 contracts with jobbers throughout Ohio, Pennsylvania, West Virginia and other surrounding states. Its business was a requirement business, in which it sold gasoline and oil products in car lots.

Throughout the period between 1929 and October of 1933, Fleet-Wing purchased substantial quantities of gasoline and oil products from suppliers other than Standard. Spears maintained active control of Fleet-Wing, and made all administrative decisions and was in consultation with officers of Standard only with respect to policy matters. Fleet-Wing spent large sums of money advertising its own trade-name products in the areas where its jobbers were located. It had complete control of all of its own credit arrangements. By 1932 it had built up its monthly sales volume to approximately 4,000,000 gallons of gasoline. Some time prior to the transaction in issue Standard purchased from Spears all of his stock and owned all of the outstanding shares of every class of Fleet-Wing.

Coming then to the transaction which occurred on June 20, 1932. The record shows that Mr. Caldwell, knowing of the impending excise tax, which was to go into effect on June 21st, had some time previously approached the officers of Standard and sought to obtain a larger-than-normal amount of gasoline so that Caldwell would be in position to compete with other retailers. Caldwell did not have the storage capacity for the amount of gasoline and oil products sought to be purchased. After some negotiation between Mr. Foster of Standard and Mr. Caldwell a lease was worked out, whereby, for a nominal rental, Standard agreed to give Caldwell the use of storage tanks at Latonia, Ky., and at Lima, Ohio. On June 20th, Standard delivered a bill of sale for 2,671,735 gallons

of gasoline which had been transferred to those tanks. The gasoline and oil products were sold to Caldwell for approximately the same prices then prevailing in the market, and the amount of gasoline and oil products thus transferred constituted a 45-day supply of Caldwell's normal requirements. The entire amount of the purchase price was paid by Caldwell within sixty days, and all of the gasoline so purchased was disposed of, through its normal channels within ninety days.

On June 20, 1932, according to the record, Fleet-Wing likewise desired to be in a position to compete with other jobbers and as a result of negotiations initiated by Mr. Spears, Standard sold to Fleet-Wing 5,932,687 gallons of gasoline and 122,036 gallons of lubricating oils. These products were then in storage tanks leased by Fleet-Wing from Standard, and located at Toledo, Lima and Cleveland where Standard had refineries. A total of 2,933,779 gallons of gasoline was sold to Fleet-Wing by Standard on June 12, 1933, a few days prior to the effective date of the imposition of an additional excise tax, enacted by virtue of the amendment contained in the National Industrial Recovery Act.

The first purchase on June 20, 1932, constituted a 45-day supply of gasoline and lubricating oils and the second, in 1933, constituted approximately a 30-day supply of similar products.

On November 30, 1932, for business reasons, Caldwell went out of existence by a transfer of all its assets to Standard, and Fleet-Wing, after October 31, 1933, became merely the agent for Standard in the distribution of its products. On the latter date Fleet-Wing was liquidated, and its assets were transferred to Standard in consideration of Standard assuming its liabilities.

Both subsequent and prior to the purchases here in dispute Fleet-Wing and Caldwell had sizeable inventories on hand, and continued to purchase large quantities of gasoline and lubricants from Standard for some period after the transactions in question, as in the normal course of their business. The record reveals that as the result of these sales Standard had not exhausted its inventory to the extent that it could not handle its usual amount of business.

The storage tanks were leased to Fleet-Wing and Caldwell for the nominal rental of $1 each. The testimony developed it

54

was the usual practice in the trade to lease tanks for nominal amounts such as these where the producer made a large sale to a jobber or purchaser who had no adequate storage facilities of his own. The producers regarded such practices as being necessary to the maintenance of goodwill of their customers, and good business usage with respect to large purchasers, who were unable or unwilling to take the risk of construction of oil and gasoline storage tanks.

It is the Government's contention upon the facts recited that the transactions were entered into for the sole purpose of avoiding tax, for no independent business purpose, and that they resulted in a fraud upon the revenue. The Government urges the transactions should be disregarded, and that the ultimate sales to the consumer should be viewed as sales by Standard, in which Caldwell and Fleet-Wing were merely the agencies and instrumentalities of Standard, and that for tax purposes, the corporate entities should be disregarded.

On the other hand, Standard contends that these were bona fide business transactions between parent and subsidiary, in the usual course of business, not sham, unreal, or fictitious.

It is evident from the reading of the voluminous briefs and the analyses of the cases cited by both parties, that there is little if any conflict in the respective contentions as to what the law is on the merits, or as to what the facts in this case are. The difference arises from the inferences drawn by the parties from these facts, and in the conclusions they reach when the settled law is applied to their own view of the facts as they see them.

It is beyond question that men possessing the highest degree of integrity and a genuine sense of proper moral conduct, so arrange their business transactions as to minimize the tax consequences which arise from them. There is a well recognized distinction in the law between fraudulent tax evasion and legal tax avoidance.

█ It is well established that the mere fact that a transaction occurs between a parent corporation and a wholly-owned subsidiary which is of benefit tax-wise to the parent does not, ipso facto, give rise to suspicion that it was tainted by an intent to commit injustice or a fraud upon the revenue of the United States. Before a court may strip the subsidiary of its corporate cloak, there must be evidence of form rather than of substance, of fiction, sham, unreality, subterfuge or something akin thereto, or the transaction must take place for the sole purpose of avoiding taxes to justify a conclusion that the subsidiary is a mere agency or instrumentality of the parent company. Confusion arises from the attempt to parallel the facts in the cases involving the question of whether in a given situation, what is done results in tax evasion or tax avoidance. Each case must rest upon its own particular facts. As Mr. Justice Holmes observed, in Bullen v. Wisconsin, 240 U.S. 625, 36 S.Ct. 473, 474, 60 L.Ed. 830:

"We do not speak of evasion, because, when the law draws a line, a case is on one side of it or the other, and if on the safe side is none the worse legally that a party has availed himself to the full of what the law permits. When an act is condemned as an evasion, what is meant is that it is on the wrong side. of the line indicated by the policy if not by the mere letter of the law."

In a later case, Superior Oil Company v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 170, 74 L.Ed. 504, Mr. Justice Holmes elaborated the rule even more pointedly:

"The fact that it desired to evade the law, as it is called, is immaterial, because the very meaning of a line in the law is that you intentionally may go as close to it as you can if you do not pass it. * * *" (Citing Bullen v. Wisconsin, supra).

In Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, Mr. Justice Sutherland, speaking for the Supreme Court, reiterated the distinction between "evasion" and "avoidance" in these words:

"* * * The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. Mississippi, 280 U.S. 390, 395, 396, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. * * *

"Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find?

Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was intended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death. * * *

"The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

Keeping these distinctions in mind, it might be well to point out that it is not open to argument that if these transactions in the light of the instant facts, had occurred between Caldwell and Fleet-Wing and some other producer than Standard, the parent corporation, there would have been no suspicion of a motive solely to avoid taxes.

Obviously then it is the relationship of Standard as a principal or sole stockholder in the two subsidiaries and the extent of control that might or might not be exercised by virtue of such ownership, that casts these transactions within the realm of doubt. This, plus the fact that any benefit that might accrue to the subsidiaries would, in the natural course of events, redound to the benefit of the corporate parent. It is precisely in such situations that the courts have found themselves faced with the problem of drawing a line beyond which they will not consider the corporate entities.

In Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217, certiorari denied 293 U. S. 583, 55 S.Ct. 97, 79 L.Ed. 679, cited with approval in Gregory v. Helvering, supra, Associate Justice Groner, speaking for the Court of Appeals of the District of Columbia, in a case where a corporation, because of its stock ownership in another corporation, was able to cause the subsidiary to accept certain bonds at a fixed price, said:

"That brings us back to the single query whether the possession of the power to do the thing the Board denounces, that is to say, the ability through stock ownership to control the corporate action, is sufficient to make a sale otherwise unobjectionable subject to be treated as a nullity for tax purposes. The only argument that can be urged in the affirmative is that it is against public policy to allow a taxpayer to incorporate his business in such a way as through manipulation or transfers between himself and it he can place the one or the other beyond the reach of the taxing statutes, and there is great force to the argument. But, so far as we know, in cases where the element of fraud in fact is lacking, it has been the invariable holding that a taxpayer may resort to any legal methods available to him to diminish the amount of his tax liability. Bullen v. State of Wisconsin, 240 U.S. 625, 630, 36 S.Ct. 473, 60 L.Ed. 830. In Iowa Bridge Co. v. Commissioner, supra, 39 F.2d 777, at page 781, Judge Gardner, speaking for the Court of Appeals in the Eighth Circuit, said: 'In fact, it is held that even though the transaction is a device to avoid the burden of taxation, or to lessen that burden, it is not for that reason alone illegal.' * * *

"Here, as we have seen, the Commissioner makes no charge of actual fraud, but on the contrary concedes that there was none. The corporation itself was legally organized and possessed all the powers and attributes of an ordinary business and, we may also assume, banking corporation. It was formed, so far as we can tell, to permit such of the business affairs of its incorporators as they should deem wise to be managed and controlled through it. * * * As the matter now stands, inequitable as it may appear, there is no statute condemning it. The Supreme Court has been at great pains to point out time and again that a corporation is a legal entity and as such wholly different and distinct from its shareholders. In a recent case the court said: 'But it leads nowhere to call a corporation a fiction. If it is a fiction it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members.' Klein v. Board of Tax Supervisors, 282 U.S. 19, 24, 51 S.Ct. 15, 16, 75 L.

Ed. 140, 73 A.L.R. 679. And again: 'A leading purpose of such statutes (incorporation laws), and of those who act under them is to interpose a nonconductor, through which, in matters of contract, it is impossible to see the men behind.' (Citing cases.)

"* * * if we are to give effect to the decisions of the Supreme Court holding under like conditions the legal entity of the corporation may not be disregarded, that the conclusion of the Board, based on the fact that, because the transaction was between the corporation and its controlling stockholders, it was not an arm's length transaction, is without force * * *."

This Court recognizes that the decision by the Circuit Court of Appeals in the District of Columbia goes far in protecting the taxpayer, and that other Circuits have limited the separate entity doctrine within closer confines.

In Page v. Haverty, 129 F.2d 512, 514, decided by the Fifth Circuit, the Court sustained the position of the taxpayer but in so doing examined not only the relationship between the parent and its subsidiaries, but the general way in which they conducted their business. It pointed out:

"Haverty Furniture Companies, Inc., made no attempt to regulate any of its subsidiaries in the general conduct of affairs, and the business policies of each were fixed by its own board of directors. All purchases, sales, personnel and managerial problems, and all financial negotiations of each subsidiary were conducted by its own officers and directors. * * *"

The rule governing the circumstances under which the corporate entity will be disregarded by the courts was most clearly stated in Berkey v. Third Avenue Railway Company, 244 N.Y. 84, 94, 155 N.E. 58, 61, 50 A.L.R. 599. Judge Cardozo said:

"We say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or a 'dummy'. All this is well enough if the picturesqueness of the epithets does not lead us to forget that the essential term to be defined is the act of operation. Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice. Ballantine, Parent and Subsidiary Corporations, 14 Cal. Law Review, 12, 18, 19, 20."

The "act of operation," referred to in Judge Cardozo's opinion, has been the subject of many pronouncements by the Supreme Court. The interpretation to be placed on these cases is a subject of wide disagreement between counsel in this case. The Government urges that Gregory v. Helvering, supra, and Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, bring this case within the rule of sham transactions that require the court to disregard the corporate form when transactions occur between parent and subsidiary. On the other hand, Standard contends these cases bulwark its contention that the facts in this case fall outside the rule announced by the Supreme Court as applied to the particular facts in those cases. As a matter of fact it is stressed by Standard that the contrast in the factual situation presented in those cases constitutes an argument for the Court sustaining their contention in this case.

The effect of the two Supreme Court cases is discussed at great length in National Investors Corp. v. Hoey, 2 Cir., 144 F.2d 466, 467, wherein Judge Learned Hand concludes:

"The gloss then put upon Higgins v. Smith, supra, was deliberate and is authoritative: it was that, whatever the purpose of organizing the corporation, 'so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.' [Moline Properties v. Commissioner], 319 U.S. [436] 439, 63 S.Ct. [1132] 1134, 87 L.Ed. 1499. That, as we understand it, is the same interpretation which was placed upon corporate reorganizations in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355, and which has sometimes been understood to contradict the doctrine that the motive to avoid taxation is never, as such, relevant. In fact it does not trench upon that doctrine; it merely declares that to be a separate jural person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, that the term 'corporation' will be interpreted to mean a corporation which does some 'business' in the ordinary meaning; and that escaping taxation is not 'business' in the ordinary meaning."

The question whether in a given transaction the corporate entity may be disregarded for the purpose of taxation is reiterated in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 708, in which Mr. Justice Black says:

"The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. (Citing Gregory v. Helvering [supra]; Minnesota Tea Company v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, [supra].) To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."

The decisions which were announced in Mehrlust v. Higgins, 2 Cir., 112 F.2d 717; Black, Starr & Frost-Gorham, Inc., v. United States, 39 F.Supp. 109, 94 Ct.Cl. 87; and E. Albrecht & Son v. Landy, 8 Cir., 114 F.2d 202, resulted as they did because the transactions were, in those cases, "disguised by mere formalisms, which exist solely to alter tax liabilities." In those cases the corporations that were organized, as was apparent from their facts, were organized solely and wholly for the purpose of avoiding taxes and all the assets of the predecessor corporations in those cases were transferred, lock, stock and barrel to the successor corporation which continued to do business just as its predecessor had done. There was no pre-existing valid corporation in any of those cases. The organization of a new corporation was a mere formalism, a device, by which it was hoped to escape tax consequences, and in fact as the Court found in those cases, the new corporation continued to do business just as the predecessor had done.

No decision can be made in this case without some discussion of that reached in Continental Oil Company v. Jones, 10 Cir., 113 F.2d 557. The Government earnestly urges that the Continental Oil case stands for the proposition that the courts will not permit the use of a corporate entity for the purpose of committing a fraud upon the revenue and it argues that the situation present in the instant case falls within the rule announced by the Tenth Circuit. To cite a finding by a court, without reference to its controlling facts, in this Court's opinion, is an abstraction. When one reads the facts which led that Court to its conclusion, it becomes evident that the finding there is wholly inapplicable here. In the Continental Oil case, its subsidiary, Conoco, was organized solely for the reason that another company had preempted the name of Continental in the State in which Conoco was to operate. The subsidiary accounted regularly to Continental, two or three times a week by transferring funds in its possession to the parent. Its general policies were determined by its officers and directors in Ponca City, its general books were kept in Ponca City, the same employes who conducted the accounting department of Continental performed the physical work of keeping Conoco's records. It reimbursed Continental for its portion of their salaries and administrative expense of doing that work; the trade-name Conoco was used both as to the product of Continental and Conoco. From the day of its incorporation until the day of its dissolution, all of the capital stock of Conoco was owned by Continental. The officers and directors of the two companies were almost identical. They had the same treasurer, the same general counsel, the main offices of the companies were in the same building in Ponca City. It is significant that as soon as Continental was in a position to use its own name in the State in which Conoco operated, Conoco was dissolved and the operation continued under the name of Continental. From all that appears Conoco was nothing more than an instrumentality of Continental for the purpose of operating in those States where it was not feasible for Continental to operate under its own name.

As to the other corporation involved in the Continental case, that referred to as "Nevada," it had never been in the oil marketing business at all until the transaction in dispute in that litigation. It was incorporated solely for the purpose of protecting the name Continental in certain States where Continental was not qualified to do business. It had only nominal capitaliza-

tion. It had never owned any gasoline or lubricating oil, had no facilities for marketing them. It was nothing more than a bare holding company, a depository for securities which were owned by Continental. As a matter of fact, Nevada, in order to dispose of these products which it had no facilities to store or sell, entered into a contract with the parent whereby Continental acted as the subsidiary's agent and resold the products at a commission. It is obvious therefore that when huge quantities of oil were transferred to Nevada and Conoco just before the effective date of the tax in question in that case, that the court was dealing on the one hand with an agency and instrumentality, a wholly owned subsidiary which, throughout its entire existence was in fact transacting business for Continental in a territory where for a time Continental was unable to do so in its own name; and, on the other hand, in the case of Nevada, with a corporation which entered into a business transaction solely for the purpose of avoiding the tax and for no business purpose independent of that. In this case, however, both Fleet-Wing and Caldwell were engaged in the marketing operations for many years prior to the organization of the companies in question. It is not disputed that they were in open competition with Standard. The testimony is uncontradicted that both in the case of Caldwell and Fleet-Wing when these corporations were organized, it was upon the understanding that the pre-existing owners would continue to operate those businesses absolutely independent of Standard. There is nothing in the record to negative that testimony. The transactions in question here were not out of keeping with the normal requirements of both corporations. That they were larger than usual was dictated by sound business and competitive reasons that would have impelled any corporation in the retailing or jobbing business to seek to augment its supplies when it knew that the advent of a new tax would increase its price to the consumer.

That the Treasury Department contemplated such transactions as these might not come within the provisions of the law as later enacted is apparent from the fact that it suggested the immediate enactment of an excise tax applicable to the sale of gasoline and oils by all non-producers possessing on the effective date of the law quantities either of gasoline or oil, in excess of certain stated amounts.

The letter addressed by the Treasury Department to Congress said:

"It appears that during the 15 days between the enactment of the law and its effective date a very large portion of gasoline stocks in the hands of producers will be transferred to selling and distributing companies to avoid the tax. Some of the largest producing companies have affiliated sales companies and can do this through their affiliates in the usual course of business * * * the Treasury may lose the tax on as much as 40,000,000 barrels. This would amount to a loss of approximately $17,000,000."

Congress which was urged and had the power to extend the tax to embrace transactions of this character, refused and failed to do so. It may be regrettable that the Government was deprived of this revenue, and it may have been desirable that the statute should have included gasoline and oil products in the possession of retailers, but this Court cannot, by judicial interpretation, do what Congress, within its legislative power, refused to do.

Caldwell and Fleet-Wing were wholly autonomous; they were in no wise subject to the will of the parent corporation; the transactions were bona fide, at arm's length dealings. In the Court's opinion, both Fleet-Wing and Caldwell possessed ample assets at the time of these transactions to justify the extension to them of the credit necessary to make these purchases. The credit of a corporation is not alone determined by its degree of liquidity. The Government's argument as to the financial inability of the subsidiaries to pay immediately for the gasoline and oil products is untenable.

The sales were for a legitimate business purpose and clearly not for the sole and independent purpose of evading the payment of taxes.

A good deal was said, both during the trial and in the briefs, concerning the Court's refusal to admit testimony as to the price charged by Caldwell and Fleet-Wing in the resale of the products purchased from Standard.

It is the Government's position that this evidence would have tended to show that the price charged by the two subsidiaries included the tax, and that Standard received an indirect benefit, because of its stock ownership, in the profit derived from the alleged additional charges. Upon this

theory, the Government urges that a recovery by Standard, in this case, would constitute unjust enrichment. It must be observed that during the trial, Government counsel conceded that Standard had not included the tax in the price of the products it sold to Caldwell and Fleet-Wing.

■ Upon the basis of this concession, the Court excluded any testimony with reference to the prices charged the vendees of Fleet-Wing and Caldwell. The Court said then, and reiterates now, that it is of the opinion the evidence could not have had any materiality on the question of Standard's liability for the taxes sought to be recovered here.

This follows because if the sales were bona fide, it is immaterial to Standard's right of recovery, what price was charged in the resale by the two subsidiaries. On the other hand, if the sales to Fleet-Wing and Caldwell were colorable and sham, Standard, in any event, would be barred from recovery.

The Government's contention is that Caldwell and Fleet-Wing, in reselling the products, ultimately passed the profit along to the parent, and that a recovery in this case would constitute unjust enrichment. That is merely another way of stating that such transactions must be held to be a fraud upon the revenue if they produce a profit to the subsidiary which eventually redounds to the benefit of the parent.

Viewing all the facts and circumstances surrounding the transactions here in question from their inception through their conclusion, under the Government's theory of the facts of this case it would be difficult, if not impossible, to conceive of a set of circumstances under which a parent could engage in any business transaction with a subsidiary corporation so as to result in a tax advantage and not be subjected to the charge that the subsidiary was the agent or the instrument of the parent. It would be purposeless to discuss the question of autonomy of the subsidiary, the purpose of its creation, the extent of its freedom of action, whether the transactions in question were at arm's length, the method of doing business, the usual nature of the parent's and subsidiaries' operation, the honesty or dishonesty involved in the transactions, the reality or the unreality of the business judgment which dictated them, all these considerations would be meaningless.

■ Tested by all the law announced in the cases cited by both parties, and measured by the fact situation present in each particular case, the Court is of the definite conclusion that there was no fraud either constructive or real upon the revenue, that these taxes were illegally assessed and unlawfully collected and that the taxpayer, The Standard Oil Company of Ohio, is entitled to recover the full amount of the taxes paid under protest, plus interest and costs of this action.