Benjamin D. Gilbert and Madeline P. Gilbert v. Commissioner.
Gilbert v. Commissioner
Docket No. 49422.
United States Tax Court
T.C. Memo 1956-137; 1956 Tax Ct. Memo LEXIS 155; 15 T.C.M. (CCH) 688; T.C.M. (RIA) 56137; June 12, 1956
*155 Fred R. Tansill, Esq., and Francis H. Davies, Esq., for the petitioners. Nathan M. Silverstein, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioners income tax for the calendar year 1948 in the amount of $48,518.65. The issues presented are (1) whether certain advances made by petitioners to a corporation and its subsidiaries in 1946, 1947 and 1948 were loans or capital contributions; (2) if the advances were loans when made, was the loss arising from the worthlessness of the debts in 1948 incurred in petitioners' trade or business; and (3) whether $4,000 advanced to a dissolved corporation on December 30, 1948, if not allowed as a business bad debt deduction, is deductible as a business expense. Findings of Fact A stipulation of certain facts was filed by the parties. We find the facts to be as stipulated and incorporate herein by this reference the stipulation and the exhibits attached thereto. The petitioners are husband and wife residing in Stamford, Connecticut. They were married in 1937. They filed their joint Federal income tax return for the calendar year 1948 with the collector *156 of internal revenue for the third district of New York. Subsequent to graduation from college in 1930, the petitioner, Benjamin Gilbert, engaged in selling securities and acting as investment counsel with a firm owned by his father. At this time he also sold advertisements in programs issued in connection with amateur plays preformed by the Players Club of Utica, New York. In 1932 Benjamin left the investment business and went into retail merchandising in Utica, New York, with the Robert Fraser, Inc. department store, where he become assistant to the advertising manager prior to leaving in 1934. During this time he also marketed fruit cakes made by his mother. In 1934 Benjamin was employed by R. H. Macy & Company, a retail department store in New York City, where he was a section manager in various departments. After four or five months' employment with Macy's he resigned to accept employment with Montgomery Ward as a copy writer, but before he actually reported to Montgomery Ward, the job disappeared. He then became connected with an advertising agency in New York City for whom he wrote copy and was an account executive until December 31, 1937. During the period when Benjamin was *157 employed by the advertising agency, he and several other people unsuccessfully attempted to develop and perfect a cold cream. On December 31, 1937, Benjamin went to work for International Industries at Ann Arbor, Michigan, a concern which manufactured the Argus Camera, Cadet Radio, and microfilm meters. Benjamin was first assigned to the microfilm department, and later was placed in charges of sales and market research on new items which the company might manufacture. Among the new items which Benjamin investigated on behalf of International Industries was a spirit duplicator, a form of ditto machine, that could make up to 400 copies of a piece of material. International Industries accepted the spirit duplicator on Benjamin's recommendation and placed him in charge of its manufacture. In mid-1939 the management of International Industries changed and Benjamin was fired. He then spent some time developing another type of duplicator which he patented and called a "Sprinter". To manufacture and market the "Sprinter" Benjamin organized a wholly-owned company, Sprinter, Inc., which was financed largely by his wife, the petitioner Madeline. Madeline is a wealthy woman, the niece of John *158 D. Rockefeller, Jr., and the beneficiary of a trust created by him and his sister, Madeline's mother. Shortages of the various materials used in the manufacture of the Sprinter, caused by the mobilization and rearmament programs, forced abandonment of the project at that time. In 1940 Benjamin developed and manufactured through Dash, Inc. [1] a smaller postcard size mimeograph duplicator which was not so dependent on critical materials. Benjamin organized a sole proprietorship bearing the name Gilbert Sales Company to market this item. However, Dash, Inc. also had to discontinue making the duplicator in 1940 due to shortages in materials. In 1940 Benjamin formed with one Clarke a partnership which acted as a broker for wooden products which were supplanting plastics, steel and rubber during the war period. The Gilbert and Clarke partnership continued to operate during the war until it terminated in 1945 with the death of Clarke. In 1940 the petitioners also were interested in two other enterprises. Madeline invested money in the Adobe Brick *159 Company, and Benjamin became a consultant for that concern. Madeline and Benjamin became stockholders in a concern known as Bolinca, which was engaged in mining gold in South America, which project was ultimately suspended due to the inability to obtain Government permission to transport a dredge from this country to South America. Benjamin was a partner in a partnership which developed a product known as "Kindle Light" consisting of wood or canvas impregnated with solid oil. One of these products, a small pocket stove for cooking without visible flame, was submitted to the Government for use in the armed forces; however, a competing model was accepted. This partnership also submitted a number of other samples to the Government of products utilizing solid oil such as flares and bombs. Gilbert acquired a patent for the making of "flock glasses" in 1941. This was a method of spraying rayon, wool, or cotton waste on the outside of a tumbler, thereby giving it a thermal coat so that the glass will not sweat or become moist when filled with an iced beverage. The flocking with these materials was not successful since it washed off too easily, but an improved formula using a latex base *160 was developed which was satisfactory. However, at that time rubber latex could not be obtained in quantity and nothing more was done with the patent. In 1942 Benjamin and Raphael Atte formed a partnership which later became Gilat, Inc., to engage in making experimental and production tools and dies for the war effort such as bullet molds, shell molds, aviation spark plugs, guys, and carbide cores used in armor-piercing projectors. Benjamin was active with Gilat, Inc. during the years 1943 to 1945, in which period the concern manufactured these items in sizeable quantities. Benjamin and Madeline both invested money in oil ventures with a Merele Walker in 1942. Madeline from time to time invested about one-half million dollars in oil properties in various forms, and received an appreciable income therefrom. In 1944 petitioners bought a family residential property at 8 E. 79th Street, New York City, and sold it at a substantial profit in 1948. Petitioners also leased at some undisclosed time a certain property at 13 Commerce Street, New York City, for a period of fifteen years. This property was a fourstory house, of which part was profitably subleased and part occupied by petitioners. *161 After the death of Clarke terminated the partnership of Gilbert and Clarke in 1945, Benjamin acquired Clarke's interest for $17,500 in cash and carried on its activities as a sole proprietor. The partnership had successfully placed contracts on a commission basis for the manufacture of wooden lockers, benches, stools and threaded bottle caps made of wood. During the war Gilbert and Clarke had been approached and asked to obtain wooden substitutes for ivory dice and other parts used in a game similar to backgammon and known as "Acey-deucey." Gilbert and Clarke invested some money in the "Acey-deucey" project but the game never caught on and its promotion was dropped. Another interest of Benjamin in 1946 was the Perfect Oven Company (hereinafter referred to as POCO). Petitioners, together with Albert Borden, also purchased stock in the Vacuum Concrete Corporation in 1946. Gilbor, Inc., a New York Corporation, was formed on June 11, 1946, with an authorized capital stock of $120,000, of which 1,000 shares were preferred stock having a par value of $100, and 20,000 shares were common stock with a par value of $1. Borden acquired 4,000 shares of common stock in Gilbor, Inc. (hereinafter *162 sometimes referred to as Gilbor), on June 27, 1946, in exchange for $40,000 in cash, and became a director and the treasurer of the corporation. Of this $40,000, $4,000 was credited to capital stock and $36,000 to capital surplus. One share of common stock of Gilbor was issued for $10 [2] cash to Stewart W. Richards, who also became a director. On July 1, 1946, Benjamin acquired 4,000 shares of common stock of Gilbor in exchange for the assets of Gilbert and Clarke, which were valued by the directors of Gilbor at $40,000, including $2,107.85 cash and good will of $35,000. The activities formerly conducted as Gilbert and Clarke by Benjamin as a sole proprietor continued thereafter as a division of Gilbor. Its principal activity at this time was the production and sale of wooden bottle closures for the cosmetic trade and this activity had been profitable. Benjamin was the president and secretary of Gilbor and actively participated in its management and Borden was treasurer and a director. Madeline was never a shareholder of record, director or officer of Gilbor but she was interested in its problems and informally participated in discussions and decisions of some of its policies. One *163 reason she never became a stockholder, officer or director of Gilbor was because it was generally known that she was a person of great wealth and she did not wish to be subject to any kind of a lawsuit involving the corporation or its management. When Gilbor was organized, there was $42,117.86 cash available for expenditures. At its first meeting the board of directors authorized and made expenditures of over $38,000, including the purchase of 3,000 shares of Vacuum Concrete Corporation stock for $24,250, the purchase of POCO stock for $12,000, and the payment of organization expenses in the amount of $1,836. At the same meeting the directors deemed it necessary "in order to conduct the business of the corporation" to borrow $15,000 from Borden. A loan of $26,000 was obtained within two months from Credit Suisse "in order to provide funds with which to conduct the operation of the corporation." The note covering this loan was guaranteed by both Benjamin and Borden, each of whom loaned personally-owned securities to Gilbor, which were pledged by it *164 as additional security for the repayment of the Credit Suisse loan. Later, when the loan was renewed, Madeline loaned some securities to Gilbor which it also used as collateral for the Credit Suisse loan. Gilbor was originally formed for the purpose of developing projects which the stockholders had as well as any other new projects which might come to them. Its corporate powers were extremely broad. The Gilbert and Clarke division was continued so that a steady income would be available for these developments and for establishing subsidiary manufacturing and marketing companies. Shortly after Gilbor was formed, the Gilbert and Clarke division lost its principal supplier of bottle closures or caps and Gilbor decided to acquire a plant of its own. Turned Woods, Inc. was formed as a subsidiary of Gilbor on October 3, 1946, and a man from Maine was hired as its superintendent. However, the subsidiary was not able to manufacture satisfactory bottle caps and eventually this business was lost. Gilbor received 96 per cent (48 shares of common stock) of the outstanding shares of this new subsidiary for $4,800. The day after Turned Woods, Inc. was formed, Gilbor advanced to it $5,000 so it *165 could buy new machinery and improve its plant, and a week later advanced to it $5,000 more to purchase lumber and materials with which to start operations. By January 1947, Gilbor had advanced to it $33,500 and held a note for this amount. At that time Turned Woods had to borrow $7,500 from a Maine bank and in order to accomplish this Gilbor agreed to subordinate its loan to that of the bank. Over $60,000 was advanced to Turned Woods by Gilbor before that subsidiary was sold in November 1948. Gilbor loaned $10,000 to POCO in June 1946, and acquired 96 per cent (48 shares of common stock) of POCO in July 1946 for $2,000 cash and the release of the $10,000 indebtedness. POCO, which was formed to produce and market an oven superior to new commercial ovens then in use, appeared to petitioners to have good prospects in 1946 but was never successful as the manufacturer was unable to produce the ovens at a competitive price. Both Benjamin and Madeline advanced over $3,290 to POCO prior to 1946 and Gilbor advanced almost $13,000 to POCO in 1946 and 1947. Gilbor acquired control of Beaver Wood Products Co., which was in financial difficulties, in January 1948 for $20,830 and changed the name *166 to Beaver Wood Products, Inc. This subsidiary was intended for the production of drawing boards, cutting boards, and other wooden flat work, but failed to produce satisfactorily for Gilbor and its unsatisfactory products seriously affected the good will of Gilbor which had been marketing these products. Gilbor acquired Integrated Wood Products, Inc. for $4,000 in February 1948, and during 1948 Gilbor advanced over $5,000 to this subsidiary. This subsidiary was formed for the purpose of marketing the product of Beaver Wood Products, Inc. because of the loss of good will Gilbor had sustained in handling its unsatisfactory products in the past. The petitioners and Borden advanced approximately equal amounts to Gilbor in the period 1946 through 1948 for necessary operating expenses. There was the understanding between petitioners and Borden to the effect that the financing of Gilbor "would be generally on about a 50-50 basis" as between petitioners on one hand and Borden on the other. Benjamin advanced funds to Gilbor on or shortly before the dates set forth below for which Gilbor issued demand promissory notes in the amounts and with the terms set forth below: Date of Note
Amount
Terms
Interest
Oct. 28, 1947
$10,000
Demand
3 1/2% payable semiannually
Dec. 9, 1947
1,000
Demand
3 1/2% payable semiannually
Feb. 20, 1948 *
6,000
Demand
3 1/2% payable semiannually
May 4, 1948 **
4,800
Demand
3 1/2% payable semiannually
Aug. 25, 1948
3,000
Demand
3 1/2% payable semiannually
Sept. 1, 1948
1,000
Demand
3 1/2% payable semiannually
Sept. 27, 1948
1,000
Demand
3 1/2%
Oct. 28, 1948
600
Demand
3 1/2%
Dec. 30, 1948
4,000
Demand
3 1/2%
Total
$31,400
*167 Benjamin made additional advances to Gilbor between September 9, 1946, and December 16, 1948, in the amount of $7,713.88, which were not evidenced by notes but were advanced on open account as needed and were expended for travel, accrued bills, salesmen's salaries, and other miscellaneous expenses, including expenses incurred by Benjamin for which he was not reimbursed. No interest was ever paid or principal ever received back on the monies advanced by Benjamin evidenced by notes or otherwise. He also advanced on open account $1,490 to Turned Woods and $1,750 to Integrated Woods Products between August and October of 1948. Madeline advanced cash funds to Gilbor on or shortly before the dates set forth below for which Gilbor issued to Madeline demand promissory notes in the amounts and with terms set forth below: Date of Note
Amount
Terms
Interest
Sept. 23, 1946
$ 1,150
Demand
Nov. 1, 1946
12,000
Demand
5%
(After
1/1/47)
Dec. 12, 1946
10,000
Demand
5% payable semiannually
Jan. 6, 1948 *
2,500
Demand
3 1/2% payable semiannually
Jan. 8, 1948 **
5,000
Demand
3 1/2% payable semiannually
Mar. 10, 1948 ***
1,000
Demand
3 1/2% payable semiannually
Apr. 28, 1948
10,000
Demand
3 1/2% payable semiannually
May 26, 1948
4,000
Demand
3 1/2% payable semiannually
June 7, 1948
1,000
Demand
July 6, 1948
500
Demand
July 12, 1948
500
Demand
July 15, 1948
1,000
Demand
3 1/2% payable semiannually
Total
$48,650
*168 The notes payable to Madeline dated September 23, 1946, June 7, 1948, July 6, 1948, and July 12, 1948, contained no interest provision. Printed forms were used for these notes which contained no place for insertion of an interest rate. Madeline never insisted that any of the notes should reflect interest. The rate of interest payable on her notes was fixed by the directors of Gilbor. She did not ask to see any financial data concerning Gilbor before making the advances to it. The note payable to Madeline dated December 12, 1946, was specifically referred to in Gilbor's minutes wherein officers of Gilbor were authorized and empowered "to borrow" $10,000 from Madeline in exchange for a demand promissory note. That note, pursuant to a resolution of Gilbor's board of directors, contained a provision stating that *169 it was "transferable immediately into preferred stock," although that privilege was never exercised. Gilbor's board of directors at the same meeting gave Borden an option to purchase the same amount of preferred stock ($10,000) for $10,000, but only after Madeline exercised her right to convert the note into stock. No payments of interest or principal were ever made by Gilbor to Madeline on any of her notes. Although all of these notes were in the form of demand notes, Madeline only made one request in April 1947 for the repayment of a relatively small amount of money. This request was not complied with and she continued to make additional advances under similar circumstances. Borden also made advances to Gilbor. He advanced funds to Gilbor on or shortly before the dates set forth below, for which Gilbor issued to Borden demand promissory notes, except for three notes with fixed maturity dates of two years, one year and two weeks, respectively, in the amounts and with the terms set forth below: Date of Advance
Amount
Terms
Interest
July 12, 1946
$15.000.00
2 years
5% semi-annually
Sept. 17, 1946
7,500.00
1 year
5% semi-annually
Apr. 15, 1947
5.000.00
2 weeks
No interest
Apr. 15, 1947
1,400.00
Demand
5%
May 14, 1947
10,600.00
Demand
3 1/2%
May 27, 1947
4,000.00
Demand
3 1/2%
Apr. 19, 1947
5,350.00
Demand
5%
Dec. 2, 1947
250.00
Demand
3 1/2% semi-annually
Dec. 8, 1947
300.00
Demand
3 1/2% semi-annually
Dec. 31, 1947
7,500.00
Demand
3 1/2% semi-annually
Jan. 28, 1948
500.00
Demand
3 1/2%
Feb. 9, 1948
2,000.00
Demand
3 1/2% semi-annually
Feb. 18, 1948
600.00
Demand
3 1/2% semi-annually
Mar. 5, 1948
400.00
Demand
3 1/2% semi-annually
Apr. 28, 1948
7,700.00
Demand
3 1/2% semi-annually
Apr. 29, 1948
3,800.00
Demand
3 1/2% semi-annually
May 21, 1948
500.00
Demand
3 1/2% semi-annually
Aug. 2, 1948
400.00
Demand
3 1/2% semi-annually
Oct. 25, 1948
350.00
Term of note not shown per books
Oct. 27, 1948
2,500.00
Terms of note not shown per books
Dec. 30, 1948
2,800.00
Terms of note not shown per books
May 31, 1948
335.64
Books unclear with respect to this entry.
$78,785.64
*170 No payments of interest or principal were ever made by Gilbor to Borden on account of these notes. The board of directors of Gilbor determined what the rate of interest on the advances was to be. On April 26, 1947, the directors resolved that thereafter interest on loans made thereafter to Gilbor would be at the rate of 3 1/2 per cent per annum. No interest was ever accrued, paid or reflected on the books of Gilbor with respect to the notes to petitioners or Borden until an audit was made as of July 31, 1948, when the interest on all the advances was accrued and reflected on the books. The petitioner and Borden never received collateral to secure any of the promissory notes issued then for their advances to Gilbor. In addition petitioners and Borden loaned personally-owned securities from time to time to Gilbor and its subsidiaries to be used as collateral in obtaining loans from outside sources. In 1946 and 1947 consolidated returns were filed for Gilbor and its subsidiaries. These returns showed total net losses for the respective years of $15,115.71 and $39,335.94. In 1948 Gilbor filed a separate return which showed a net loss of $137,968.51 and claimed bad debts as follows: *171 (1) Turned Woods, Inc. for notes receivable and open account items, $67,637.15. (2) POCO for notes receivable and open accounts, $12,905.65. (3) Integrated Wood Products for notes receivable and open accounts, $5,481.79. Gilbor's return for 1948 also reflected worthless securities in these three subsidiaries of a total amount of $17,800. By December 1948 petitioners had given up any hope that Beaver Wood Products, Inc. would be successful. Gilbor filed a certificate of dissolution on December 16, 1948, pursuant to Article 10 of the New York State Stock Corporation Law because the corporation was then in an insolvent condition, and unable to pay its debts. POCO went into bankruptcy in February 1948. Turned Woods, Inc. and Integrated Wood Products were also insolvent in that year. Benjamin advanced $4,000 to Gilbor on December 30, 1948, to pay rent, salaries and other operating expenses in an effort "chiefly * * * [to] collect the most out of Beaver Wood Products" and also to pay its creditors. Benjamin also advanced in 1948 on open account $1,490 to Turned Woods, Inc. on September 30, 1948, and $1,750 to Integrated Woods, Inc. for the purpose of settling their affairs. *172 Upon liquidation of Gilbor, Turned Woods, Inc. and Integrated Wood Products, the petitioners received $10,494.63, $40, and $65, respectively. On their joint income tax return for 1948, petitioners claimed bad debt deductions in the total amount of $80,404.25, consisting of the following: Gilbor, Inc.
$77,269.25
Turned Woods, Inc.
1,450.00
Integrated Wood Products, Inc.
1,685.00
The Commissioner disallowed these deductions on account of bad debts, but allowed $69,386.67 as long-term losses and $7,017.58 as short-term losses. No deduction of any kind was allowed on account of the $4,000 advanced to Gilbor on December 30, 1948. In their petition, petitioners alleged that the full amount of $80,404.25 was deductible as a business had debt and, in the alternative, that $76,404.25 was so deductible and the $4,000 advanced to Gilbor in December 1948 was properly deductible as a business expense. The advances of Benjamin to Gilbor and its subsidiaries were contributions to capital and were not bona fide loans giving rise to a real debtor-creditor relationship. Madeline's advances to Gilbor gave rise to bona fide debts owed to her by Gilbor, but the loss resulting *173 from their worthlessness was not incuired in her trade or business. The $4,000 advanced to Gilbor by Benjamin on December 30, 1948, was not deductible as a business expense. Opinion KERN, Judge: The first question to be determined is whether the advances by petitioners to Gilbor and its subsidiaries were contributions of risk capital or gave rise to bona fide indebtednesses on the part of the corporations. This is essentially a question of fact upon which the petitioners have the burden of proof. . In that case the Court of Appeals quoted with approval from , affd. , as follows: "Bookkeeping, form and the parties' expression of intent or character, the expectation of repayment, the relation of advances to stockholdings, and the adequacy of the corporate capital previously invested are among circumstances properly to be considered for the parties' formal designation of the advances are not conclusive * * *." In the instant case some of the "circumstances" specifically referred to in the above quotation favor the petitioners' contention on this issue *174 and other substantiate the respondent's argument. In view of all of the circumstances established by the voluminous record herein, we have concluded that the advances by Benjamin were, in reality, contributions of risk capital and did not give rise to bona fide debts on the part of the corporation. See ; . The status of Madeline's advances to Gilbor has given us considerable trouble. Respondent, in his contention that they are capital contributions, relies upon , affirming . In our opinion the facts of the instant case differ sufficiently from the facts in the Matthiesson case to justify a conclusion that Madeline had an intention, although it was vague and not based upon valid reasoning, that her advances to Gilbor should be loans and this intention was acquiesced in by the corporation, and further, that the facts here justify the ultimate conclusion, which we have reached not without doubt, that Madeline's advances properly had the status of bona fide debts rather than contributions to capital. However, these *175 debts owing to Madeline were non-business debts the loss from the worthlessness of which was not incurred in her trade or business. The rule of cases such as , and others relied upon by petitioners as persuasive to the effect that the advances of Madeline to Gilbor gave rise to business bad debts, "is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves." See . It seems obvious to us that this is not one of those exceptional situations. Madeline is a wealthy woman and appeared to be a devoted wife who interests herself in her husband's activities. On several occasions she has given financial assistance to her husband and the business projects in which he has been interested, obviously in an attempt to get her husband established in a successful business. The rendering of this assistance, while perhaps establishing a praiseworthy pattern of conjugal *176 financial cooperation, does not, in our opinion, constitute a trade or business. The few investments shown by the record to have been made on her own account are only of the minimal number and amounts to have been expected on the part of a person of her means. Petitioners argue on this issue of the nonbusiness character of the debts, if any, that respondent's present alternative position to the effect that the debts, if they are debts, are non-business rather than business debts is inconsistent with the statutory notice of deficiency, and that this issue can be raised in this proceeding only by amended answer. It is our view that the respondent's alternative position on this issue is not inconsistent with the deficiency notice and is properly before the Court on the allegations in the petition which are denied in the answer. We also point out that the thorugh and able presentation of testimony on this point by petitioners' counsel completely negatives any possibility that there was an element of "surprise" in the consideration of this issue as a part of the case. Petitioners also contend that the $4,000 advanced by Benjamin to Gilbor on December 30, 1948, even though it was obvious *177 at the time that it would not be repaid, should be deductible as a business expense on the authority of ; ; and . However, the record herein does not disclose the existence of facts similar to those in the cited cases which justified there the allowance of deductions. Here there is no evidence that the advances in question were made to protect and promote any business of Benjamin's. They must be considered as a voluntary contribution of capital which was known to be worthless when made and therefore not deductible. . Decision will be entered under Rule 50. Footnotes
1. In the transcript of testimony this name appears as "Dasc" but the parties in their brief's agree on the spelling of this name as "Dash".↩
2. In the transcript this amount appears as "$1.00" but the parties in their briefs agree that it properly is the amount of $10.↩
*. This date was incorrectly stated on the return. (Ex. 1-A-Ex. D(1)) as February 18, 1948. ↩
**. This date was also incorrectly reflected on the return where it appeared as April 28, 1947.↩
*. The note comparable to this appearing on the joint return (Ex. 1-A - Ex. D(1)) is erroneously indicated there as being dated January 7, 1948. ↩
**. Similar to the foregoing item, this note was erroneously indicated on the return as being dated January 12, 1948. ↩
***. Like the two foregoing items, this note was erroneously shown on the return as being dated March 11, 1948.↩