**Benjamin D. and Madeline Prentice GILBERT, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 331, Docket 24469.**

United States Court of Appeals Second Circuit.

Argued April 10, 1957.

Decided Sept. 26, 1957.

**400**

Francis E. H. Davies, New York City (Fred R. Tansill and Goodwin, Rosen-baum, Meacham & White, Washington, D. C., of counsel), for petitioners.

Charles K. Rice, Asst. Atty. Gen., Hilbert P. Zarky and Fred E. Young-man, Attys., Dept. of Justice, Washing-ton, D. C. (Joseph Goetten, Washington, D. C., of counsel), for respondent.

Before HAND, MEDINA and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

This case presents a recurrent problem in the income tax field, namely whether advances by a taxpayer to his corpora-tion will be treated as loans for tax pur-poses.

The facts are fully stated in the find-ings and opinion of the Tax Court, 15 T.C.M. 688, but the following abbreviated summary will serve as background to the ensuing discussion. The critical ques-tion in the case is: what is the principle to be applied by the finder of the facts in determining whether a given advance of money by a shareholder to a closely held corporation is a loan within the meaning of the Internal Revenue Code? As we cannot tell from the record before us what was the principle, or what were the standards, applied by the Tax Court, we are remanding the case for further and more explicit findings.

The taxpayers, husband and wife, filed a joint return for the taxable year 1948, claiming bad debt deductions in the amount of $80,404.25, for advances made by them in the years 1946, 1947 and 1948 to Gilbor, Inc. The Tax Court held the advances made by the husband to be con-tributions to capital, and hence, as to him, did not reach the subsidiary ques-tion of whether such advances were de-ductible only as nonbusiness bad debts within the meaning of Section 23(k) (4), of the applicable Internal Revenue Code of 1939, 26 U.S.C.A. § 23(k) (4). As to the wife the Tax Court found her ad-vances to be debts but only deductible as nonbusiness bad debts, but this issue and some others decided by the Tax Court in this case are not now in dispute be-tween the parties. Accordingly, the Tax Court affirmed the deficiency assessed by

the Commissioner for the year 1948 in the amount of $48,518.65.

Gilbor, Inc. was organized as a New York corporation on June 11, 1946, with an authorized capital stock of $120,000, of which 1,000 shares were preferred stock having a par value of $100, and 20,000 shares were common stock with a par value of $1. Gilbert, the husband petitioner, and one Borden became the principal stockholders and there was an understanding between them that the financing of Gilbor, Inc. "would be generally on about a 50-50 basis." On June 27, 1946 Borden acquired 4000 shares of common stock in exchange for $40,000, of which $4000 was credited to capital stock and $36,000 to capital surplus. On July 1, 1946 Gilbert acquired 4000 shares of common stock in exchange for the assets of a business owned by him, which were valued by the directors of Gilbor, Inc. at $40,000, including $2107.-85 cash and good will of $35,000. As in the case of Borden, $4000 was credited to capital stock and $36,000 to capital surplus. One share of common stock was issued for $10 cash to one Richards, and $1 was credited to capital stock and $9 to capital surplus. Both Gilbert and Borden became officers and directors and Gilbert, as president, "actively participated in the business" of Gilbor, Inc.

Most of the available cash was promptly expended in the purchase of the stock of other enterprises which Gilbor, Inc. took over, and Borden loaned the corporation $15,000. From time to time, during the years 1946, 1947 and 1948, until the corporation was liquidated at the end of the taxable year 1948, further advances were made by Gilbert and his wife on the one hand, and Borden on the other. The loans by Gilbert, for which demand promissory notes were issued, and the rates of interest payable thereon were as follows:

| | | | | | |
|---|---|---|---|---|---|
| Oct. | 28, 1947 | $10,000 | Demand | 3½% | payable semiannually |
| Dec. | 9, 1947 | 1,000 | Demand | 3½% | payable semiannually |
| Feb. | 20, 1948 | 6,000 | Demand | 3½% | payable semiannually |
| May | 4, 1948 | 4,800 | Demand | 3½% | payable semiannually |
| Aug. | 25, 1948 | 3,000 | Demand | 3½% | payable semiannually |
| Sept. | 1, 1948 | 1,000 | Demand | 3½% | payable semiannually |
| Sept. | 27, 1948 | 1,000 | Demand | 3½% | |
| Oct. | 28, 1948 | 600 | Demand | 3½% | |
| Dec. | 30, 1948 | 4,000 | Demand | 3½% | |
| | Total | $31,400 | | | |

The advances by Mrs. Gilbert were:

| | | | | | |
|---|---|---|---|---|---|
| Sept. | 23, 1946 | $ 1,150 | Demand | —— | |
| Nov. | 1, 1946 | 12,000 | Demand (After 1/1/47) | 5% | |
| Dec. | 12, 1946 | 10,000 | Demand | 5% | payable semiannually |
| Jan. | 6, 1948 | 2,500 | Demand | 3½% | payable semiannually |
| Jan. | 8, 1948 | 5,000 | Demand | 3½% | payable semiannually |
| Mar. | 10, 1948 | 1,000 | Demand | 3½% | payable semiannually |
| Apr. | 28, 1948 | 10,000 | Demand | 3½% | payable semiannually |
| May | 26, 1948 | 4,000 | Demand | 3½% | payable semiannually |
| June | 7, 1948 | 1,000 | Demand | —— | |
| July | 6, 1948 | 500 | Demand | —— | |
| July | 12, 1948 | 500 | Demand | —— | |
| July | 15, 1948 | 1,000 | Demand | 3½% | payable semiannually |
| | Total | $48,650 | | | |

Further advances from time to time were made by Gilbert on open account; but the amount owing Borden at the end was more or less the same as that owing Gilbert and his wife. All these sums were used "for necessary operating expenses." Moreover, shortly after the corporation was organized a loan was negotiated with the Credit Suisse "in order to provide funds with which to conduct the operation of the corporation," and the note covering this loan was guaranteed by both Gilbert and Borden, each of whom put up personally-owned securities as additional security. Other personally-owned securities were loaned at various times by Gilbert and Borden to Gilbor, Inc. and its subsidiaries, to be used as collateral in obtaining other loans from outside sources.

The note payable to Mrs. Gilbert, dated December 12, 1946, for $10,000, contained a provision that it was "transferable immediately into preferred stock," although the privilege was never exercised; and, at the same meeting at which the loan on such terms was authorized, Borden was given an option to purchase the same amount of preferred stock for $10,000, this option to be available only if Mrs. Gilbert exercised her right to convert the note into stock.

During its existence the corporation was actively engaged in the prosecution of various ventures, with the usual ups and downs, but none of them came up to expectations, and no profit was earned in any year. No interest was ever paid on any of the notes issued to Gilbert or his wife, nor was any interest credited on the books until shortly before the end.

The finding of the Tax Court was: "In view of all of the circumstances established by the voluminous record herein, we have concluded that the advances by Benjamin [Gilbert] were, in reality, contributions of risk capital and did not give rise to bona fide debts on the part of the corporation."

The problem, which typically arises as the result of an advance by a shareholder to a closely held corporation, has been dealt with in scores of cases. Generally we find an effort by the taxpayer to induce the Commissioner and the courts to make a finding that these transactions are loans. Two major reasons for this are: (1) the Code provides a deduction for "all interest paid or accrued within the taxable year on indebtedness," I.R.C.1954, Section 163(a), 26 U.S.C.A. § 163(a) I.R.C.1939, Section 23(b); and (2) when a business "debt" becomes worthless the lender is entitled to a full deduction not subject to the limitations imposed on capital losses, I.R.C.1954, Section 166(a), 26 U.S.C.A. § 166(a), I.R.C.1939, Section 23(k).[1]

By way of preliminary, it is trite to say that the mere empty form of the transaction does not preclude further inquiry. It is always open to the Commissioner to prove that the transaction is not what it appears, that the parties truly intended to and actually did enter into another and hidden agreement by which their rights are to be governed. It is also clear that, for purposes of the federal tax statute, even though the parties have intended to create a debt, the courts will not recognize it as such as against the taxing power if they have failed to create a binding obligation. Day v. Helvering, 2 Cir., 121 F.2d 856; Johnson v. Commissioner, 2 Cir., 86 F.2d 710.

The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, Commissioner of Internal Revenue v. O. P. P. Holding Corp., 2 Cir., 76 F.2d 11, too great a variation will of course preclude such

1. See Note, Thin Capitalization and Tax Avoidance, 55 Colum.L.Rev. 1054; Holzman, Current Trend in Guaranty Cases, 11 Tax L.Rev. 29, 45, which also suggest additional reasons taxpayers may seek to have advances characterized as loans for tax purposes.

treatment. Gregg Co. of Del. v. Commissioner, 2 Cir., 239 F.2d 498; Jewel Tea Co. v. United States, 2 Cir., 90 F.2d 451.

Assuming then that the true nature of the obligation has been established, and that it is not so unlike a classic debt as to preclude treatment as such, the inquiry is not yet ended, for "the form of a transaction as reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them." Bazley v. Commissioner, 331 U.S. 737, 741, 67 S.Ct. 1489, 1491, 91 L.Ed. 1782. This principle is generally said to derive from Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, the essential facts of which were as follows. The taxpayer owned all the stock of the United Mortgage Corporation, which had among its assets 1000 shares of the Monitor Securities Corporation. The taxpayer set up the Averill Corporation and three days later United Mortgage transferred to Averill the 1000 shares of Monitor stock, for which all the shares of Averill were issued to the taxpayer. Three days later Averill was dissolved and the taxpayer received the Monitor shares as a liquidating dividend. As a result of these transactions, which were said to be a "reorganization" under Section 112(i) (1) (B) of the Revenue Act of 1928, 26 U.S.C.A. § 2112(i) (1) (B), the taxpayer claimed that a much smaller amount of tax was due than would have been due if United Mortgage had simply given the taxpayer the Monitor shares as a dividend. The Commissioner disagreed. In upholding the Commissioner the Supreme Court said (293 U.S. at pages 468–470, 55 S.Ct. at page 267):

"It is earnestly contended on behalf of the taxpayer that since every element required by the foregoing subdivision (B) is to be found in what was done, a statutory reorganization was effected; and that the motive of the taxpayer thereby to escape payment of a tax will not alter the result or make unlawful what the statute allows. It is quite true that if a reorganization in real-ity was effected within the meaning of subdivision (B), the ulterior purpose mentioned will be disregarded. The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Superior Oil Co. v. State of Mississippi, 280 U.S. 390, 395–396, 50 S.Ct. 169, 74 L.Ed. 504; Jones v. Helvering, 63 App.D.C. 204, 71 F.2d 214, 217. But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. The reasoning of the court below in justification of a negative answer leaves. little to be said.

"When subdivision (B) speaks of a transfer of assets by one corporation to another, it means a transfer made 'in pursuance of a plan of reorganization' [section 112(g)] of corporate business; and not a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either, as plainly is the case here. Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was. created. But that corporation was nothing more than a contrivance to the end last described. It was brought into existence for no other purpose; it performed, as it was in-·

tended from the beginning it should perform, no other function. When that limited function had been exercised, it immediately was put to death.

"In these circumstances, the facts speak for themselves and are susceptible of but one interpretation. The whole undertaking, though conducted according to the terms of subdivision (B), was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else. The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute. To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose."

The principle of the Gregory case has been applied again and again by the Supreme Court. In Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 278, 84 L.Ed. 319, the Court held that the payment to a wholly owned corporation of a sum due to its owner was properly understood as a payment to the owner for purposes of inclusion in his personal income, stating that " 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed —the actual benefit for which the tax is paid.' * * * Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *. What Lay gave Griffiths in reality got, and on that he must be taxed." In Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 357, 84 L.Ed. 406, decided three weeks later, the taxpayer was denied recognition of a loss upon a sale of securities to his wholly owned corporation. "It is clear an actual corporation existed," the Court said, but "There is not enough of substance in such a sale finally to determine a loss." Bazley v. Commissioner, supra, like Gregory, speaks of the necessity for a business purpose in a "reorganization" if it is to be recognized for tax purposes. The holding is that "A 'reorganization' which is merely a vehicle, however elaborate or elegant, for conveying earnings from accumulations to the stockholders is not a reorganization under § 112." The Court held that there had been no "reorganization" within the statutory meaning, even though there undoubtedly had been a reorganization in some sense.

The principle that emerges from these cases is that statutory terms are not to be interpreted independent of their context and underlying policy. "Legislative words are not inert, and derive vitality from the obvious purposes at which they are aimed * * *." Griffiths v. Helvering, supra. Thus, not every plan that reorganizes is a "plan of reorganization" under the Code, not every sale is a transaction that can cause a "loss" for tax purposes, and not every advance cast in the form of a loan gives rise to an "indebtedness" which will justify a tax deduction.

Before discussing what we understand the Congress to have meant by "debt" or "indebtedness," we think it helpful to point out that the taxpayer's motive is not the crucial factor. This is but a corollary of the undoubted proposition, "The incidence of taxation depends upon the substance of a transaction." Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981.

It will be noted that in Gregory the Supreme Court repeatedly stated that the taxpayer's desire to reduce her taxes was irrelevant, that "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended," and that tax savings would follow "if a reorganization in reality was effected within the meaning of subdivision (B)." Its holding was that "the transaction upon its face lies outside the plain intent of the statute." Although there had been a reorganization and "No doubt, a new and valid corporation was created," the Court held there was no "reorganization" with-

in the meaning of the Code, because the substance of the transaction did not measure up to what the Congress intended when it used the term. The Court proceeded by "Putting aside * * * the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred * * *." 293 U.S. at page 469, 55 S.Ct. at page 267.

As we said in Johnson v. Commissioner, supra, 86 F.2d at page 712:

> " * * * it is too well settled to require discussion that legal transactions cannot be upset merely because the parties have entered into them for the purpose of minimizing or avoiding taxes which might otherwise accrue. Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355; Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 15, 101 A.L.R. 200; Sawtell v. Commissioner, 1 Cir., 82 F.2d 221, 222; Commissioner v. Yeiser, 6 Cir., 75 F.2d 956, 958. Despite such purpose, the question is always whether the transaction under scrutiny is in reality what it appears to be in form."

And in Loewi v. Ryan, 2 Cir., 229 F.2d 627, at page 629, we said:

> "We cannot agree * * * that a taxpayer is not privileged to liquidate his security for whatever purposes he thinks most profitable, among them the reduction of his taxes. It is so abundantly settled in decisions of the Supreme Court [citing cases] that a taxpayer's motive is irrelevant in determining his liability that we need not cite the very numerous decisions of the lower courts. It has at times been said that Gregory v. Helvering * * * is at war with this doctrine * * *. * * * the Act is to be interpreted against its own background, and in deciding how far it adopted all legal transactions that the state law may have covered, it was proper to exclude those that

had no other result than to evade taxation."

A dissenting opinion urged that the deduction claimed should be allowed only if the taxpayer chose to liquidate his security at a particular time "because of what he, in good faith, regards as valid business considerations (other than tax reduction) * * *; the taxpayer's subjective reactions, in that respect, are controlling." But we rejected that view, saying, "he is free to choose his time, whatever his purpose." We held the controlling factor to be *result*, not *motive*.

In Kraft Foods Co. v. Commissioner, 2 Cir., 232 F.2d 118, at pages 127, 128, we reaffirmed our holding in the Loewi case, saying:

> "The Commissioner contends that the debenture issue should be disregarded for tax purposes because it served no business purpose other than the minimization of taxes. Although the taxpayer attempts to find a business purpose in the replacement of an artificial financial structure with a more realistic one, it concedes that tax considerations were the primary motivation of the debenture issue. Assuming, then, that the purpose of the transaction was to minimize taxes, should the transaction be disregarded because of its tax motivation?

> "The Commissioner argues that transactions, though formally perfect and in compliance with a provision of the tax statute, must be disregarded if they have no purpose germane to the conduct of the business other than tax minimization. He relies on Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Minnesota Tea Co. v. Helvering, 1938, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Griffiths v. Helvering, 1939, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 1941, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct.

707, 89 L.Ed. 981; Bazley v. Commissioner, 1947, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782; Commissioner of Internal Revenue v. Culbertson, 1949, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659. We do not think that these cases hold that tax minimization is an improper objective of corporate management; they hold that transactions, even though real, may be disregarded if they are a sham or masquerade or if they take place between taxable entities which have no real existence. The inquiry is not what the purpose of the taxpayer is, but whether what is claimed to be, is in fact."

In many cases in which the Gregory principle is called into play the question is whether a tax-significant transaction has occurred. But this is not to say that Gregory has application only where the question is whether a transaction is to be completely ignored for tax purposes. The principle is fully as applicable where there is no doubt that a very real transaction has taken place and the question is whether the characterization urged by the taxpayer accords with substantial economic reality. In either case the taxpayer must show that his treatment of the transaction does not conflict with the meaning the Congress had in mind when it formulated the section *sub judice.*

This principle must be observed in determining whether advances are properly treated as loans under the "interest on indebtedness" and "bad debt" sections of the Code. As we said in Kraft Foods Co. v. Commissioner, supra, 232 F.2d at page 123, "It is now a commonplace that words have many meanings, each dependent upon their context. Thus, 'indebtedness' as used in a federal taxation statute may not carry the same meaning as the same word used in the context of corporate finance." Numerous cases have denied taxpayers deductions on the ground that obligations which constituted valid indebtedness for other purposes were not such

within the meaning of the Internal Revenue Code. A large collection of such cases and incisive analyses may be found in the Columbia Law Review note cited in footnote 1 and in 4 Mertens, Law of Federal Income Taxation §§ 26.10c–26.12.

There can be little doubt that such holdings are correct where the advances were made under such circumstances as to negative any reasonable expectation of repayment. Thus, in Hoyt v. Commissioner, 2 Cir., 145 F.2d 634, 636, we held that "notes taken on account of advances by a taxpayer who believes at the time that the notes are worthless and uncollectible cannot be deducted as bad debts because they are in the nature of gifts," and in American Cigar Co. v. Commissioner, 2 Cir., 66 F.2d 425, 427, we held that "advances, made in the belief they would not be repaid, are in the nature of gifts, and are not deductible as bad debts."

Not all cases are so clear, however, and in determining whether advances to closely held corporations may properly be treated as loans for tax purposes, the courts have stressed one or more of a number of factors, including the debt-equity ratio, the presence of an agreement to maintain proportionality between the advances in question and acknowledged risk capital, the presence of tax avoidance motives, the use to which the funds were put, whether outside investors would make such advances, and lack of reasonable expectation of repayment. These are proper subjects of consideration, for the Congress evidently meant the significant factor to be whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business, and, as we shall show, each of the enumerated items does or may bear on the degree of the risk involved.

From the point of view of the corporation, the Code allows a deduction for "interest paid * * * on indebtedness," yet it allows no deduction for dividends paid. Thus, where a corpora-

tion pays for the use of money which it will return, it is in effect allowed a deduction for a business expense, just as it is allowed a deduction for the expense of renting a building. Where, however, a corporation pays dividends, it is not incurring a business expense; it is distributing profits. While interest and profits are not always distinguishable, they are distinct concepts, and the distinction, however imperfect it may be in a particular case, lies in the degree of risk involved. Thus, it would do violence to the congressional policy to permit an "interest" deduction where the "loan" is so risky that it can properly be regarded only as venture capital.

■ Similarly, the Congress decreed different treatment for the loss of funds advanced with reasonable expectations of repayment, whether to earn interest or for some other reason, than it did for the loss of funds risked upon the success of a business venture. Here again it would do violence to the congressional policy to allow a bad debt deduction in the case of a loss which is as a matter of substantial economic reality a loss of risk capital.

The relationship of "nominal stock investments" or "an obviously excessive debt structure," to use the phrases employed by the Supreme Court in John Kelley Co. v. Commissioner, 326 U.S. 521, 526, 66 S.Ct. 299, 302, 90 L.Ed. 278, to the degree of risk involved is clear. Any "loan" to the corporation in such circumstances would necessarily be venture capital in reality, for any business loss by the corporation would be reflected in an inability to repay the "loan."

An agreement to keep "loans" proportioned to acknowledged risk capital is indicative that the funds "loaned" were understood to have been placed at the risk of the business. There is no apparent reason for such an agreement where repayment seems fairly certain. Such an agreement is readily understood, however, where there is real danger that the money might be lost, for by means of such an agreement each stockholder risking additional capital in the form of

a "loan" can be assured that his percentage of the equity and control will remain in correspondence with his shares of the risk. In other words, a reluctance to "lend" money to the corporation unless his fellow shareholders "lend" proportionate amounts belies a feeling of confidence that the funds will be returned regardless of the success of the venture. And the shareholder's understanding of the degree of risk involved is of course relevant in determining what is in fact the degree of risk involved.

Where the courts have spoken of tax avoidance motives, they have as a rule had reference to their conclusions rather than to the evidence. The statement that the taxpayer was seeking to avoid taxes has been used as the equivalent of the statement that the taxpayer has tried to base a deduction on an advance which was in fact too risky to qualify as a loan for tax purposes. As we have shown, the motives and expectations of the taxpayer are relevant only insofar as they contribute to an understanding of the external facts of the situation.

The relationship to the degree of risk of the use of the funds advanced, whether outsiders would be willing to make such advances, and the reasonableness of the expectations of repayment are too plain to require discussion.

■ Turning now to the case before us, we are unable fully to understand the basis for the Tax Court's holding that "the advances made by Benjamin [Gilbert] were, in reality, contributions of risk capital and did not give rise to bona fide debts on the part of the corporation." Moreover, it is difficult to know whether the Tax Court meant to hold that because of some secret agreement the parties did not establish a debtor-creditor relationship in any sense, or that although such relationship was established it did not give rise to debts as that term is used in the Internal Revenue Code. It is the duty of the Tax Court to distinguish with clarity what it finds as fact, and what it holds as conclusions

of law. Dobson v. Commissioner, 1943, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248.

▮ Even if the decision of the Tax Court is construed as resting only on the latter ground, i. e., that the advances did not give rise to debts as that term is used in Section 23(k), we are reluctant to affirm, or to reverse its decision without remanding back for further findings. The opinion of the Tax Court only states a conclusion without assigning the reasons therefor. This makes it impossible for us to determine whether appropriate standards have been employed in reaching that conclusion.

Furthermore, in considering the advances by the wife to the corporation the Tax Court apparently treated as determinative its finding that "Madeline had an intention, although it was vague and not based upon valid reasoning, that her advances to Gilbor should be loans and this intention was acquiesced in by the corporation * * *." 15 T.C.M. at page 694. Insofar as this indicates either that the Tax Court adopted some sort of subjective test or that all inquiry ends upon a finding that the obligation actually created will be treated as debt for non-tax purposes, we think that court erred.

Accordingly, the cause is remanded for proceedings consistent with this opinion.

WATERMAN, Circuit Judge (concurring).

I concur in remanding this cause to the Tax Court for further proceedings.

The opinion of the Tax Court does not state the ground upon which its decision rests. Therefore, affirmance or outright reversal by us would not be a review of the Tax Court's decision but an initial determination by us of the correctness of the deficiency assessed by the Commissioner.

The differences within our Court relate to the stating of the principles that we believe should govern the Tax Court when it reconsiders this case upon remand.[1] I am in accord with the approach expressed by Judge Medina.[2]

The petitioners and the Commissioner have argued this appeal upon the theory that the decision of the Tax Court was a decision of fact and that it may not be disturbed unless clearly erroneous. I cannot agree. The issue before the Tax Court and this court is whether the advances made by Gilbert gave rise to "debts" as that term is used in Section 23(k) of the Internal Revenue Code. Such an issue is not merely one of fact. It is an issue—often called a "mixed question of law and fact"—which calls for the application of a statutory term to a particular set of facts. Prior to 1948, the courts were required to affirm Tax Court decisions made in cases that involved such mixed questions if the decision had "a 'warrant in the record' and a reasonable basis in the law." Dobson v. Commissioner, 1943, 320 U.S. 489, 501, 64 S.Ct. 239, 246, 88 L.Ed. 248. But in that year, Congress amended 26 U.S.C. § 1141(a) [3] and this amendment,

1. There is, of course, no disagreement among the members of the court if the decision of the Tax Court, based upon substantial evidence, is that the notes in issue were a mere pretense and "that the parties truly intended to and actually did enter into another and hidden agreement by which their rights were to be governed." Only if the Tax Court concludes that the parties truly intended to create debts will the discussion contained in this concurring opinion be relevant.

2. I do not understand Judge Medina's opinion to hold that the motive of a taxpayer

is never a proper subject of inquiry. Cases may arise—indeed, this may be one —in which the Commissioner may contend that the way the taxpayer reports a transaction upon his income tax return must be disregarded because it does not evidence the entire true transaction and is a mere pretense. In such a case, the desire of the taxpayer to avoid his taxes is a relevant subject for inquiry because it provides a motive for the sham which the Commissioner seeks to prove.

3. This amendment inserted the italicized words into the statute:

becoming law subsequent to the decision in Dobson v. Commissioner, requires, I believe, that we examine in detail the issues presented here.

If characterization of the advances made by Mr. Gilbert depended solely upon the terms of the instruments under which the parties' rights were governed, it is clear that the decision of the Tax Court would have to be reversed. Each note received by Gilbert contained an unconditional promise to pay 3½% interest semi-annually and to pay the principal upon demand. The notes were transferable, and did not by their terms confer the right to participate in the management of the corporation.[4] Moreover, the notes were not subordinated to the claims of other creditors. Unlike the situation presented in Gregg Co. of Delaware v. Commissioner, 2 Cir., 1956, 239 F.2d 498, where so-called "hybrid" securities were involved, these instruments are on their faces ordinary unsecured interest-bearing promissory notes payable upon demand.

But numerous cases have indicated that even though the form of the instrument evidencing an advance of funds is appropriate to the creation thereby of a debt, the circumstances surrounding the creation of the obligation may be such as to indicate that characterization of the advance as a loan would be improper within the meaning of the federal tax statute. Thus, in Reed v. Commissioner, 2 Cir., 1957, 242 F.2d 334, where the instruments were promissory notes similar to the obligations in the present case, this court, after an appraisal of the surrounding circumstances, sustained the Tax Court's determination that the advances

there in question were contributions to capital and not loans. Cf. Gregg Co. of Delaware v. Commissioner, supra.

Although the facts of Dittmar v. Commissioner, 1955, 23 T.C. 789 are not identical with those in the present case, that decision is not without application here. There, the taxpayer, a stockholder, had made continuous advances to the corporation in response to needs for both capital assets and working capital without regard to the normal creditor safeguards. Under these circumstances, it was held that the advances were not loans to the corporation as the taxpayer contended but were contributions to corporate capital. It is true that in that case, unlike the present case, no formal instruments evidencing indebtedness were executed, but the similarities in the two cases are most impressive. In each the alleged loans were unsecured even though the interest on prior loans was in default and the corporation had a continuous history of losses. In each no attempt was ever made to enforce the obligations.[5] Since the distinction between loans and contributions to capital depends in part upon the type of risk assumed by an investor, the fact that the advances were made under circumstances more closely approximating those associated with the investment of equity capital is relevant to a determination of the character of the advances for purposes of federal income taxation.

Another circumstance tending to support the conclusion of the Tax Court is the agreement between petitioner and Borden that the financing of Gilbor, Inc., was to be shared equally between them. While this factor is not conclusive, it is one which "subjects the transaction

"§ 1141. (a). The United States Courts of Appeals and the United States Court of Appeals for the District of Columbia shall have exclusive jurisdiction to review the decisions of the Tax Court, except as provided in Section 1254 of Title 28 of the United States Code, *in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury;* and the judgment of any such court shall be final, except that it shall be subject to review by the Supreme Court of the United States upon certiorari, in the manner provided in Section 1254 of Title 28 of the United States Code."

4. This factor is, of course, of limited significance in a closely held corporation, especially where, as here, the notes are issued in proportion to shareholdings.

5. These facts would also tend to support an inference that at the time the advances were made the parties did not truly intend that they should give rise to enforceable debts.

to close scrutiny." Wilshire & Western Sandwiches, Inc., v. Commissioner, 9 Cir., 1949, 175 F.2d 718, 721; 1432 Broadway Corp. v. Commissioner, 1945, 4 T.C. 1158, affirmed per curiam 2 Cir., 1947, 160 F.2d 885. The agreement has particular significance in this case because of other evidence that the parties intended that distributions made by the corporation should at all times be equal to their proprietary interests. In December 1946, the board of directors authorized the officers of Gilbor to borrow $10,000 from Mrs. Gilbert in exchange for a demand promissory note. That note, pursuant to the resolution of the board, contained a provision that it was "transferable immediately into preferred stock." At the same meeting the board of directors gave Borden an option to purchase $10,000 of preferred stock, exercisable by him only upon the condition that Mrs. Gilbert exercise her conversion rights. The clear purpose of granting this option to Borden was to protect his right to share equally with the Gilberts in the anticipated distributions of the corporation.

The Commissioner also relies upon the fact that the cash available for expenditures was from the beginning insufficient to finance the scope of activities which the parties apparently planned. The pertinence of this argument is not, however, clear. We have decided several cases in which the inadequacy of equity capital contributed to characterization of advances as contributions to capital rather than as loans. E. g., 241 Corporation v. Commissioner, 2 Cir., 1957, 242 F.2d 759; 1432 Broadway Corp. v. Commissioner, supra. But as indicated by the Supreme Court in John Kelley Co. v. Commissioner, 1946, 326 U.S. 521, 66 S. Ct. 299, 302, 90 L.Ed. 278, this test has value only in "extreme situations such as nominal stock investments and an obviously excessive debt structure." In a case such as the present, where the ratio of debt to equity never exceeded 2.19 to 1, the "thin corporation" standard is of no value. It is not clear, however, whether this is the thrust of the argument, or whether the Commissioner contends that since the parties from the start knew there would be a need for larger amounts of capital, all later advances must be considered as having been invested as equity rather than as having been loaned. In either case, it would appear that the argument must fail. Once it is established that the parties' equity investment is more than nominal, the means by which the corporation's activities are financed is a matter to be handled in whatever way seems most advantageous to it. Wilshire & Western Sandwiches, Inc., v. Commissioner, supra.

It appears to me that the only factors which tend to support the conclusion of the Tax Court are that the advances were made in proportion to the equity investments of the parties and that they were continuously made without regard to normal creditor safeguards under the circumstances.[6] The need for safeguards is attested to by the fact that when the parties obtained outside loans these loans were secured not only by the property of the corporation, but also by the personal guarantees of Gilbert and Borden. Whether these factors are sufficient to preclude characterization of the advances as loans for income tax purposes is a question which, at least in the first instance, must be answered by the Tax Court.

LEARNED HAND, Circuit Judge (dissenting).

The Tax Court found that Gilbert's advances to Gilbor, Inc., did not create "bona fide debts," and to that I cannot agree, for I can find no evidence that would support that conclusion, if by "bona fide debts" one means debts that are valid as between the petitioners and the corporation. Whatever may have been the earlier doctrine it is, I think, now settled that a debt to the holder, or holders, of all the shares of a corporation will in case of insolvency be on a parity

---

**6.** The record discloses that this factor may have been given little weight by the Tax Court, for it characterized the advances made by Mrs. Gilbert as loans even though she never sought or obtained such safeguards.

with debts to outsiders. It is true that in Flynn v. Loewer Realty Co., 2 Cir., 167 F.2d 318, 320, we said that a sole shareholder who lends money to the corporation, is at an advantage over outside creditors in that he controls the conduct of the enterprise, and is actuated by the hope of more than the return of his principal and interest; but that alone is no reason for imposing upon him a fiduciary relation vis-a-vis other creditors. In any event, whatever may have been the effect of the earlier decisions, in Comstock v. Group of Institutional Investors, 335 U.S. 211, 229, 68 S.Ct. 1454, 1463, 92 L.Ed. 1911, the Supreme Court declared that some abuse of the shareholder's control must appear before his debt loses its parity with other debts: "In the case before us there was domination of the subsidiary, a relationship between corporations which the law has not seen fit to proscribe. * * * It is not mere existence of an opportunity to do wrong that brings the rule into play; it is the unconscionable use of the opportunity afforded by the domination to advantage itself at the injury of the subsidiary that deprives the wrongdoer of the fruits of his wrong." Our latest decisions have been in accord with this doctrine,[1] and I can see no distinction between a case of two corporations, one holding all the other's shares, and a corporation and two individuals, who between them hold all its shares and act in common. Hence it follows that, if Gilbert and Borden in fact meant to make their advances debts of the corporation there was nothing to defeat their purpose.

However, it is also settled that, although the rights of a taxpayer may be absolute as between himself and his corporation, the law will at times refuse to regard those rights in assessing his income tax. That doctrine stems from Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; at least that is the source usually ascribed to it. It is a corollary of the universally accepted canon of interpretation that the literal meaning of the words of a statute is seldom, if ever, the conclusive measure of its scope. Except in rare instances statutes are written in general terms and do not undertake to specify all the occasions that they are meant to cover; and their "interpretation" demands the projection of their expressed purpose, upon occasions, not present in the minds of those who enacted them. The Income Tax Act imposes liabilities upon taxpayers based upon their financial transactions, and it is of course true that the payment of the tax is itself a financial transaction. If, however, the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose. Gregory v. Helvering, supra; Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 308 U.S. 473, 478, 60 S.Ct. 355, 84 L.Ed. 406; Bazley v. Commissioner, 331 U.S. 737, 741, 67 S.Ct. 1489, 91 L.Ed. 1782. When a taxpayer supposes that the transaction, in addition to its effect on his tax, will promote his beneficial interests in the venture, he will of course secure the desired reduction, for it would be absurd to hold that he must deny himself an economic advantage unless he pay the tax based upon the facts that have ceased to exist. Moreover, he will also be relieved, if he supposes that the transaction will, or may, cause him a loss, although in that event it is true that his only motive will be to avoid the tax. For instance, if a very rich man sells shares of stock and invests the proceeds in municipal bonds, he will not be taxed on the dividends of the shares, although his only motive was to avoid the tax upon his dividends. It might have been possible in such situations, when the only motive was to reduce taxes, to assess a tax, measured by the difference between the tax still due, and that that would have been due but for the transaction. However, there is not

---

1. Schwartz v. Mills, 192 F.2d 727; Gannett Co. v. Larry, 221 F.2d 269; Kraft Foods Company v. Commissioner, 232 F.2d 118, 126.

the slightest intimation of such a doctrine in any of the decisions; it covers only those transactions that do not appreciably change the taxpayer's financial position, either beneficially or detrimentally.

I am not sure that this differs from what my brothers mean; but I do not agree with the form of the test that, as I understand it, they wish the Tax Court to adopt; and, indeed, I am not clear as to what it is. To say that it is whether the transaction has "substantial economic reality," or "is in reality what it appears to be in form," or is a "sham" or a "masquerade," or "depends upon the substance of the transaction": all of these appear to me to leave the test undefined, because they do not state the facts that are to be determinative.

I would therefore substitute this which seems to me to avoid that defect and at the same time state the doctrine adequately:

"When the petitioners decided to make their advances in the form of debts, rather than of capital advances, did they suppose that the difference would appreciably affect their beneficial interests in the venture, other than taxwise?"

The burden will be on them to prove that they did so suppose.